At the January term, 1839, the following opinion was delivered in the supreme court:
By the Court, Cowen, J.
It was not denied that Rachel White, the propositus, inherited ex parte paterna, and died without lineal descendants. It followed that the premises in question could not go to her mother, or her connexions, the De Groves, through her. Rachel White was of the blood of the De Groves, and it was not contended that hearsay from deceased members of the De Grove family thus connected with her, might not be received as to the state of her immediate family ; nor was it necessary to deny that, for the fact was notorious, and beyond dispute. She having died without issue, and all claimants ex parte materna being out of the question, the law then goes in search of her collateral relatives on the side of her father. To prove that she had none, or in other words, that her father had none, the declarations of deceased members of the family of a Grandson of Adolph De Grove, the latter being an uncle of the propositus, were offered in evidence. The first reason for its rejection by the learned judge was proof of declarations by deceased members of the De Grove family, and of reputation in that family, that Rachel White died leaving no collateral heir on the father’s side, was inadmissible, because not drawn from members of the family of John Anderson;; he held *that.,to be admissible, the declarations and reputation proposed, [ *209 ] must be drawn from, and exist, in the family of John Anderson, and not elsewhere.
This matter was put upon the argument as if the proposition had been to prove the declarations of some persons not at all connected in blood. But I do not understand that to be so. The search was after the collateral relations of Rachel White—on her father’s side to be sure ; but it was no less an inquiry as to her blood relations to be carried into the family of one of them. They being related to her, would naturally be acquainted with the history of her family connexions, not merely on their own, but also her father’s side. It is not essential that the declarant should be connected with both branches of her family. 2 Russ. & Mylne, 156. Adolph De Grove *160 was her mother’s brother ; and the hearsay was sought for in the family of his grandson. I am not aware that the law has, in point of competency, limited an inquiry into this hearsay concerning pedigree, within any particular degree of relationship; though in old families like this, the sources of inquiry are of course, proportionably remote, and the answers less distinct and less reliable. In this view I do not understand it to be denied that the question addressed to Catharine De Grove was admissible.
But the counsel for the defendant go a step, higher, and consider this an inquiry for the relatives of Rachel White’s father, Gaft. Anderson, carried into the family of his connexion by marriage. Yet even in this view, I do not understand the authorities as absolutely precluding the inquiry. It has been admitted in several modern cases. In Doe, ex dem. Northey v. Harvey, 1 Ry & Mood. 297, the lessor of the plaintiff claimed as the heir ex parte materna of Mary Rowe ; and in order to show that she had heirs ex parte paterna, the declarations of her deceased husband were received. Littledale, J. said the husband must, for this purpose, be considered as one of the family. In Doe, ex dem. Tutter v. Randall, 2 Moore & Payn, 20, the declarations of a deceased woman of what her first husband used to say, were received. Her declarations were made after actual connection by marriage had ceased; but she had once held a relation rendering it [ *210 ] *very probable that she would learn truly from her husband who was his heir. The principle on which such traditionary evidence is received on questions of pedigree is quite familiar; and I shall therefore only say it will be found very well stated by Burrough, J. in the case last cited, p. 26. The declarations of deceased servants, or intimate acquaintances, are not admissible. Johnson v. Lawson, 9 Moor, 183. 2 Bing. 86, S. C.; Waldron v. Tuttle, 4 N. H. Rep. 371; Doe d. Sutton v. Ridgway, 4 Barn. & Ald. 53. But Johnson v. Lawson, distinctly admits that the declarations of deceased relatives may be received, without limiting them by blood ; and this on the authority of Vowles v. Young, 13 Ves. 140. Lord Erskine there speaks of a reputation of descent being established by a reía, tion however distant; and the case itself held that a declaration by a de. ceased husband might be proved, to show that his wife was illegitimate. That would be to show that she could have no heirs. I hardly think that any case has gone quite so far as was proposed in the one at bar, to seek for reputation among marriage connexions, if the proposition is to be regarded in that light; but the authorities are far from absolutely cutting off their declarations. In one case the court said the hearsay must be derived frow the husband in respect to the wife’s relationship, and seemed to intimate that the declaration of a more remote marriage connexion would be inadmissible. Crease v. Barret, 1 Cr. M. & R. 928. This does not appear to be fully settled.
*161 I do not pursue the inquiry, however, because I feel quite clear, that whatever might be our conclusion as to this ground of objection, the evidence was inadmissible within the salutary rule established by the Berkley Peerage Case, 4 Camp. 401, as being of declarations made postlitemmotam. Chapman v. Chapman, 2 Conn. Rep. 347, 349, S. P. Both these cases hold, and they carry their own vindication of the principle, that statements made, though by persons otherwise reliable,' being after a suit brought or a claim started upon the question to which they relate, become entirely inadmissible on account of the supposed bias under which they were uttered. The same rule prevails in relation to several other branches of hearsay evidence, the authorities upon which it *is unnecessary to notice, [ *211 ] since they are so strong upon the matter in hand. Here it is admitted that some of the family of the De Groves, relations of the witness to whom the question was addressed, and perhaps concerned in interest to aver the want cf collateral heirs, on the’ side of Rachel White’s father, without which their own claims must utterly fail, both at law, and in all hope at the hands of the legislature, have kept up a continual claim and struggle to obtain this land ever since the revolution. It was said by the attorney general that the evidence proposed would not better their title. That may be technically so ; but they do not appear to have been conscious of it. The exclusion does not arise from an assumption that they have a good claim, but from the circumstance that they claim at all in hostility to the fact of collateral heirs ex parte paterna. They need not have an interest tangible to the law, like a witness called to the stand. It is enough that they have an interest in the question, or have believed that they had a claim and asserted it. Beeper Richardson, C. J. in Waldron v. Tuttle, 4 N. H. Rep. 378. The declarations proposed to be given in evidence, were plainly of a date posterior to the institution of their claim, and were properly rejected on that ground. A new trial is therefore denied.
The attorney-general sued out a writ of error removing the record into this court, where the cause was argued by
Willis Hall, (attorney-general,) for the people.
M. T. Reynolds, for the defendants in error.

Points on the part of the plaintiffs in error:

1. The proof sought to be given, and which was excluded by the circuit judge, was not offered to establish the pedigree or genealógy of any family or individual, but to prove the extinction of a particular class of persons. But if the rules of evidence which govern in cases of pedigree, were applicable to the question as presented, it would still be competent to *162 [ *212 ] prove by reputation in the Be Grove family, and by *declarations of deceased members of that family, (they being blood relatives of Rachel White, although not blood relatives of her father, John Anderson,) that she left no blood relatives on her father’s side, and this was the substance of the proof sought to be obtained, and which was excluded by the circuit judge, although held by the supreme court, to be admissible, notwithstanding that objection.
2. The controversy and claim, on the part of members of the De Grove family, some or all of them, which was proved, furnished no valid objection to the admission of the evidence as offered. The principle which excludes declarations made post litem motam, is inapplicable to the question presented in this case. 4 Camp. N. P. Reports, 401, Berkley Peerage Case. 2 Conn. R. 347, Chapman v. Chapman. 1 Peters R. 328, Elliot and others v. Peirsol and others.
After advisement, the following opinions were delivered:
By the Chancellor.
The first question for our consideration is whether the circuit judge was right in supposing that no evidence of declarations of deceased persons can be received upon a question of pedigree, except the declarations of blood relations. Upon this question the decision was clearly wrong. The cases referred to in the opinion of Mr. Justice Cowen, show that it is the constant practice to receive evidence of the declarations of persons connected with the family by marriage as well as of those who were connected with it by the ties of consanguinity. Indeed it is the constant practice of the courts to receive inscriptions from ancient tomb stones as evidence of pedigree, as well to show who were the collateral relatives of the descendant, as to prove who were the children, and to do so without inquiring whether the monument and inscription were placed there by those who were connected with the decedent by blood, or by the ties of affinity only.
Where either the husband or the wife survives the other, we all know that the inscription upon the tomb-stone is usually directed by the survivor ; or at least that the information, so far as relates to pedigree which [ 213 ] the inscription contains, usually comes from that *source; and yet, if such inscription described a deceased husband as having been the natural child of A. B., and the issue of the decedent happened to fail one hundred years afterwards, there could not be a doubt that the attorney general might legally give that inscription in evidence to show there was a bar of illegitimacy, which precluded the possibility of there being any collateral heirs of such decedent who could lawfully inherit the estate which came from him by descent. The result would be the same in the case of a grave-stone, if it appeared from the inscription thereon that it was erected *163 to the memory of the deceased by his brother-in-law, showing that he died without leaving any blood relatives, or that his parents were aliens.
Again : the circuit judge erred in deciding that none but those who were of the blood of Anderson were competent to make declarations, showing that Mrs. White died without heirs, even if the declarations of blood relatives were necessary in cases of pedigree. The attorney-general was endeavoring to show that Mrs. White had no heir-at-law, capable of inheriting this estate. Adolph De Grove was a blood relative of hers, although not connected by the ties of consanguinity with her paternal ancestors.
The decision of the circuit judge necessarily excluded all other evidence of reputation coming from the relatives of the mother’s side, as well as the declarations of Adolph De Grove, who claimed as the heir of his sister and the members of his family. But as Mrs. Anderson died in 1779, before the change in the law of descents, the claim of Adolph, that he wras entitled to the land as heir of his sister, could not affect the declarations which might have been made by the sister who married an Albertson, or reputation coming from that branch of the family of the mother of Mrs. White. It does not appear, however, that the attorney general was prepared to give any evidence of reputation in that branch of the family other than what was derived from the declarations of the maternal uncle, as to the inquiries set on foot by him.
If the question, whether Mrs. White left any paternal relatives, had any connection with the claim set up by Adolph De Grove as the heir At law of his sister, there is no doubt '’’that any declarations to [ *214 ] that effect made by him or his descendants who claimed through him, ought to have been rejected as made post litem motam, although a suit had not been actually commenced involving the question as to which those declarations were made. That, however, was not the question presented in the Berkeley Peerage case, for in that case the question was actually in issue in the court of chancery upon the point, whether there was a marriage by the deceased earl before the birth of the complainants, the elder children, who had filed a bill against the younger children to perpetuate the evidence of the first marriage. It was, therefore, the testimony of the father upon the very question in issue in the subsequent claim of peerage: for if the first marriage had not taken place, the claimant was not entitled to the earldom; and the son born after the other undisputed marriage was the legitimate heir to that title of honor. In that case, the first question as stated for the opinion of the judges, which questions are always stated in the form of a hypothetical case, was, whether upon the trial of a suit between different parties, the testimony of a witness in another suit upon the same point is admissible, after his death, in a matter of pedigree, the witness being the father of the party whose legitimacy was to be established in both suits ? The *164 opinion Of the judges upon the third question, however, shows that to exclude evidence of pedigree, it must appear that the declaration was made after an actual controversy has arisen upon the question to which the declaration relates, although it is not necessary to show that the person knew that a suit was commenced or about to be commenced to litigate that question. The second question stated fbr the opinion of the judges was, wheth. er, upon the trial of a suit in ejectment where it was necessary for the plaintiff to prove that he was the legitimate son of T, who was then dead, an entry made by his father in the family bible, stating that the plaintiff was his eldest son, born in lawful wedlock, from the wife, stating her name and the date of the birth, would be received as legal evidence to prove the legitimacy of the plaintiff as' evidence of the declaration of the deceased father in a matter of pedigree, although it should be proved [ *215 ] *on the trial that the supposed father had declared that he made such entry for the express purpose of establishing the legitimacy and the time of the birth of the plaintiff, in case the same should be called in question by any person, or in any cause whatever after the death of the person making such entry ? Chief justice Mansfield delivered the unanimous opinion of the twelve judges, that such entry, whether made in the bible or any other book, or on any other piece of paper, would be admissible in evidence as a declaration of the father in a matter of pedigree, notwithstanding the professed views with which it was made. The judges added, that the particularity of the entry would be a strong circumstance of suspicion ; but still it would be receivable as evidence, whatever the credit might-be to which it would be entitled. 4 Camp. Rep. 418. The decision upon , this last point thus declares the rule of law to be, that in questions of pedigree, the declarations of deceased relatives are -not to be absolutely rejected because there is room for suspicion that they may have been, made for a sinister purpose, if the party making them has no interest in establishing their truth, unless a controversy had already arisen between two or more persons upon the points to which the declarations related, which had' actually produced a litigation between them, or which probably must tend to such a result.
Here the claim on the part of Adolph de Grove was, that he was entitled to the land as heir of his sister, upon the ground, I presume, stated by Mrs. Hartwick, that it had been purchased by the husband with her ' money, which was sent from Holland. There is no evidence that the defendants, or those under whom they entered into possession, ever pretended to claim title from or under any collateral relative of John Anderson. The question whether Anderson had or had not any collateral relatives, therefore, could not possibly aid Adolph de Grove in sustaining his claim to the land as heir at law of the widow, who could not, upon any supposition, be the heir of her *165 daughter or of her husband, as to this land. I think, then, the fair presumption to be drawn from the depositions was, that Adolph De Grove, finding that his claim to the lands as heir of his sister could not be sustained, ‘"after ascertaining from the deed, which, probably,. [ *216 ] came into the possession of Ann White, who remained in possession of the premises after the death of Mrs. Anderson, that such deed was not given to his sister, but to her husband, set the inquiry on foot in Scot, land for the purpose of finding the collateral heirs of his deceased niece, on the part of the father, to enable him to obtain title by purchasing their interest in the premises; and that he in this way ascertained that no collateral relatives could be found.
Indeed, it cannot be necessary for the attorney general, in any case, to give positive evidence of the failure of heirs of the person last seized, for the purpose of showing that the land has escheated. Every body must, of necessity, have collateral relatives, unless the line of his descent from Noah, or that of all his relatives who might otherwise have inherited, lias been broken by alienage or attainder, or crossed by a bar sinister. As the law, however, never requires an absurdity, it is not necessary to give any thing like positive evidence that the inheritable blood of the person last seized does not flow in the veins of any other descendant of Adam, the original progenitor of the whole human race, in order to establish a title by escheat. But if no blood relatives of the person last seized are known to exist, the people of the state are presumptively entitled to the vacant succession. It is only necessary, therefore, for the counsel for the people to give general evidence, showing that no persons have been found to claim the premises as heirs at law of the person last seized; leaving it for those who wish to show a title out of the state, either in themselves or a stranger, to prove that such heirs do in fact exist.
Here, I think, the deposition of Adah Albertson, who was a connection by marriage of the person last seized, was of itself sufficient to cast the burthen of proof upon the defendants, of showing that Mrs. White left heirs ex parte paterna to inherit this estate from her. The witness was acquainted with the widow of Anderson, who continued to reside in the house for many years after the death of her husband and daughter without being disturbed by any one claiming to be the heir of the blood of Anderson, and Mrs. Hartwick shows *that Captain White continued [ *217 ] to reside with her as her son, having married her deceased daughter; and he afterwards brought his second wife there to live, who continued in possession after the death of the widow of Anderson, in 1779. Under these circumstances, I think the judge should have permitted the reputation among the maternal relatives to have gone to the jury in connection with these facts, as sufficient evidence of the escheat of the property; unless *166 the defendants could show that there were at the commencement of this suit, some heirs of the first Mrs. White in existence capable of inheriting this lot; or could show that they were entitled to hold it by adverse possession. x
For these reasons, I have arrived at the conclusion, that the decision of the circuit judge was erroneous, and that tfie non-suit should have been set aside, and a new trial granted. I, therefore, shall vote to reverse the judgment of the supreme court.
By Senator Paige.
It may be deemed a point unsettled whether declarations of marriage connexions, as to pedigree, are admissible in evidence. In some instances, the declarations of the husband or wife of the propositus have been received ; but I believe no case can be found where the declara, tions of a more remote marriage connexion have been received. No case has gone as far as was proposed here, viz : to show by declarations of remote marriage connexions (not Blood relations) of John Anderson, that he died leaving no relation or heir, except his daughter, Rachel White, and that Rachel White left no collateral heir, ex parte paterna. But withóut deciding this question (although I strongly incline against the evidence,) I am clear that the evidence was inadmissible upon the ground that the declarations were made post litem molam, after the claim to the premises in question was preferred by the De Grove family ; which claim was in hostility to the fact of collateral heirs, ex parte paterna, of Rachel White. Berkeley-Peerage case, 4 Camp. N. P. R. 401, and cases cited in opinion of Cowen, J.
*By Senator Verplanck.
We might be authorized to set aside the non suit and grant a new trial in this case, upon either of two distinct grounds, if they appeared on the record: 1st. It might be done, if the evidence admitted, made out such a presumptive proof of defect of heirs (however slight and inconclusive against any opposing testimony) as was sufficient to raise any question of fact for the jury, and, 2d. A new trial should be granted if any legal evidence was improperly excluded by the judge.
What then is the evidence absolutely necessary to raise a presumption, or mere naked probability of the defect of heirs, for the consideration of the jury in the case of a claim of escheated lands ? The rule of escheat in this state is distinctly declared and enacted in our Revised Statutes: “ The people of this state, in their right of sovereignty, are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of this state; and all lands, the title to which shall fail from the defect of heirs, shall revert or escheat to the people.” 1. R. S. 718. The statutes further enact that the title of the people of the state to any real property by escheat» *167 must be established by an action of ejectment, to be brought for the recovery thereof, in which action the proceedings shall in all respects be similar to those usually had in other actions of ejectment, with the exception that it may be brought as against unknown claimants. 1 R. S. 282. Now the great principle of the action of ejectment, as it is expressed by Kenyon and Ellenborough, and adopted in all the text writers, (English and American,) is, that “ the party claiming must prevail by the strength of his own title ; not by the weakness of that of his adversary.” What degree of evidence is necessary, then, to make out any presumption or probability whatever, sufficient in the absence of opposing testimony, to show the state’s title by reason of defect of heirs, or to furnish any ground for a verdict in favor of the people ?
The ordinary rational as well as legal presumption as to every person, is that he must have some relations, and consequently some heirs, however remote, and whether known to him or not. From the natural laws of human ^relationship, this must be so, and the necessary pre- [ *219 ] sumption must be, that every citizen dying leaves some one entitled to claim as his heir, however remote, unless one or other of the only two exceptions known to our law should intervene. That law has established that an 'alien cannot inherit real estate, and that the illegitimate child can claim no legal relationship through his parents. In order then to make an absolute failure of heirs possible, there must be either illegitimacy of the person last seized, or of some near ancestor, or else he must be sprung from a foreign stock, through which the policy of our laws has determined that no inheritable blood can flow. Otherwise, no matter how distant the relationship, or to how remote an ancestor the descent may be traced, still there must be somewhere, persons living, who came from the same common dtock.
The title of the state by reason of defect of heirs, can clearly be made out by actual proof of the fact of alienage or of illegitimacy, or, in certain cases, by proof of the reputation of either of those facts. But the rational and usual rules of evidenoe will allow us to go further. Proof'of the fact of there being no knoion heirs of the deceased may well raise a presumption, that for some unknown reason, the inheritable blood had failed ; provided that such proof be direct and positive, founded upon inquiry, advertisements, personal family knowledge or the actual declaration of the person last seized, or of those from whom his title descended. But can we with propriety go further than this, and permit the natural and general presumption of kindred to be combated at all, by proof of mere hearsay reputation of the general fact of defect of relations and heirs ? This appears to me to give a much greater latitude to the admission of hearsay evidence of the vaguest kind, to support a negative fact in opposition to the ordinary laws of natural descent, *168 that has ever been given in respect to similar or analogous traditionary testimony. .Now the only evidence offered in this cause was of this vague and general character. For it must be observed that the evidence makes no pretence of alien descent, but in fact admits the reverse. It went to [ *220 ] show Scotch descent, which at the period of the death of the “last known heir would imply inheritable blood. On this view of the whole evidence offered, it may be doubted whether the non-suit ought not to be sus tained for this reason alone.
But without deciding that question, it is quite clear to my mind that if the Judge was right in excluding the evidence of reputation of defect of heirs, upon the particular grounds on which he did so, then there was nothing left to go to the jury in support of the state’s title by escheat, as the only remaining fact was that admitted by the defendants, that Rachel White, to whom the estate descended, died without issue. Now surely the mere naked fact, that a person formerly seized of the estate died without issue or lineal heirs, ra;ses no presumption whatever of a failure of collateral heirs; whilst the natural presumption is the other way, and in favor of the existence of heirs somewhere existing. Supposing, then, the evidence offered of the understanding in the Re Grove family, that “Anderson died without leaving any relative but his daughter,” to be in itself proper and material, ought it to have been received from that quarter, and under the peculiar circumstances of the case ?
The great principle of our law as to hearsay or similar secondary evidence is thus clearly and briefly stated by Chief Justice Marshall: “ Hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge7 Granch. R. 290. Accordingly, when from lapse of time, the facts of descent, relationship or marriage, are no longer susceptible of proof by witnesses who speak from their own knowledge, then, and then only evidence of the declarations of . deceased members of a family, or of reputation among them as to pedigree and relationship is admissible. It is then received because no better evidence is accessible; because these were the persons most likely to know the facts in question; and because, ordi.narily, they could have no temptation to falsehood or misrepresentation on such a subject. In the present case, the judge excluded evidence of this kind because the reputation, of which proof was offered, was that entertained or expressed among the relations of the wife of the person from whom the. [ *221 ] descent is traced, and not *among his relatives by blood. • I see no reason, upon the principle on which such sort of evidence is ever received, thus to limit the inquiry to the relations of the same blood with the person whose descent, issue or relationship may be the subject of investigation. In fact, near family connexions ly marriage are often more *169 likely to be more accurately acquainted with such facts than more distant relations of the same blood. The reasons for the admission of such secondary evidence hold good in the one case as much as in the other. The cases are not consistent on this point, and some of them go to the exclusion of such testimony; whilst others, as Vowles v. Youngs, 13 Vesey R. 140; Northey v. Harvey, 1 R. & Mood 297 ; Tutter v. Randall, 2 M. & Payne, 20, (as collected by Judge Cowen in his opinion in this case,) would authorize its reception; and as these latter appear to me to coincide with the reason of the general rule, I think they should be followed. I moreover assent to the distinction of the attorney general—that this is not merely an inquiry whether Anderson, the father left blood relations, but whether his daughter left such by her father’s side; and this information, according to any understanding of the rule of evidence, might be sought for and ascertained from the declaration of any of her relatives, whether on the paternal or maternal side.
On the second ground of exclusion, however, I fully concur with Judge Cowen—that the former claim and controversy among his family, touching the descent of the property in question, was good ground for excluding the evidence of declarations and reputation among them. The well known principle of our law is to exclude all hearsay testimony. An exception is allowed when the facts, as in cases of pedigree or of old prescription, are no longer susceptible of direct proof by living witnesses. Still, in order to adhere as closely as practicable to the policy of shutting out all vague, second-hand and unauthenticated evidence, such exception is made in favor of proof of declarations and reputation only where the person whose opinion and declarations are relied upon, besides being those most likely to be well informed as to the facts, were also, so far as appears, free from all possible inducement to misrepresent the truth themselves, or [ *222 ] from any danger of being misled by others so interested. The principle of this rule, as well as of the other analogous exceptions to the more general doctrine, has been clearly stated by Lord Chancellor Eldon : “ The whole goes upon this: declarations in the family descriptions in wills, upon monuments, or in Bibles and registry books, all are admitted upon the principle that they are natural effusions of a party who must know the truth, who speaks upon an occasion when his mind stands in an even position, without any temptation to exceed, or to fall short of the truth:” Whitlock v. Baker, 13 Vesey R. 514. When, however, there is proof of the existence of any controversy, involving the question sought to be settled by such evidence, such a presumption of entire impartiality and absence of any cause of error must cease. Those who then swear to reputation and declarations, may perhaps swear to what were only the declarations and opinions of one set of claimants among their family, which might have been as strongly de *170 nied by others. When there thus ceases to be good ground for presuming such declarations to correspond with the common belief or knowledge of the family at- the time, there is the same reason for shutting out such traditionary evidence as there is for rejecting the hearsay rumours of the day as proof of more recent facts.
Such is the well established usage and rule of the English law, as appears from the opinion of the judges and law peers of England, in the Berkeley Peerage case, 4 Campbell R. 401, and I think the rule wisely established. It may indeed sometimes shut out evidence of truth, but it must commonly operate in the salutary nature of a statute of limitations, protecting honest possessions and bona fide subsequent purchases from the ■ danger of being shaken by inaccurate or distorted family traditions, growing out of old con-.tentions. • It does not rest upon any arbitrary rule or mere authority, but is placed by the eminent and experienced judges who delivered opinions in the Berkeley ease upon general reasons and long judicial or professional experience of the nature and character of evidence. Ch. Baron [ *223 ] MacDonald and Judge Bayley indeed *limit their reasoning to the effect of a prior controversy, leading to litigation on the very point on which evidence of declarations is offered: that being the very case before them ; but the whole train of argument of the others, especially Judges Lawrence and Heath and Baron Wood, go beyond this, and apply to any former controversy as to property, touching or involving the subject of controversy. In the present case there was a long continued claim to the property now in litigation, by the members of the family, the evidence of whose declarations is now offered, and they had deemed the very subject of present inquiry so important in respect to their own rights, that (as stated in one of the depositions) an inquiry was said to have been set on foot by them in Scotland, to ascertain whether any heirs of Anderson could be found. It is not easy to ascertain how the fact of the existence of such heirs was understood to affect this claim, which appears to have been founded on descent, not from Anderson himself, but from his wife’s family. Still it is clear that the claimants thought it important in some way or other.
Such declarations and reputation in a family are. received at second hand as evidence, because, (in Judge Lawrence’s' words) “ when the relation has no interest to serve, and there is no- ground for supposing that his mind stood otherwise that even upon the subject (which may be fairly inferred, before any dispute upon it has arisen) we may reasonably suppose that he neither stops short of, nor goes beyond the truth in his spontaneous declarations touching his relations and family.” So also Baron Wood: “ Declarations to be receivable in evidence must have been the natural effusions of the mind of the party making them, and must have been made when his mind stood in an even position, without any temptation to exceed, or fall *171 short of the truth.” Such, too, is the doctrine of Lord Eldon, in 13 Vesey R. 514; but here, it is evident that the minds of the Re Groove family did not stand in this even position. They had nob that presumptive impartiality which is allowed to supply the want of the sanction of an oath. They were excited and biassed by -the hopes and fears attendant on litigation. If the rule “ that actual litigation or litigous controversy without actual suit, *always vitiates the hearsay declaration of [ *224 ] those in whose family it existed,” be narrowed down to controversies upon the very point afterwards sought to be ascertained, and strictly and legally involving it, the reason of the rule is lost sight of. The result would be to exclude such family traditions, when the parties had an accurate knowledge of their legal rights, or the legal grounds of their claim, whilst it would admit them in cases, where the claim pursued with equal ardor and interest is erroneously understood by the parties themselves, and where, for that very reason, they and their friends are more' exposed to see the whole question and its evidence through a false medium, and to suffer their feelings to disturb or discolor their recollections or relations of facts. The spirit and reason of the rule, in my judgment, therefore, extend to every ancient controversy involving or affected by the question afterwards in litigation, or supposed at the time, to involve it, or be affected by it.'
The judgment of the supreme court should be affirmed.
On the question being put, shall this judgment he reversed? ten members of the court answered in the affirmative, and thirteen in the negative. Whereupon the judgment of the supreme court was affirmed.