HIRAM SMITH et al., Appellants, v. THE CITY OF ROCHESTER, Respondent.

The riparian owners of lands adjoining fresh-water, non-navigable streams, take title to the thread of the stream, and as incident to the title acquire

the right to the usufructuary enjoyment of the undiminished and undisturbed flow of said stream.

This is so also as to the fresh water navigable streams and small lakes within this State where the tide does not ebb and flow; save that the public has an easement in such waters for the purpose of travel, as on a public highway, which easement, as it pertains to the sovereignty of the State, is inalienable and gives to the State the right to use, regulate and control the waters for the purposes of navigation.

This public easement gives the State no right to convert the waters or to authorize their conversion to any other uses than those for which the easement was created, *i. e.*, for the purposes of navigation.

The right to divert the waters for other uses, although public in their nature, can only be acquired under and by virtue of the sovereign right of eminent domain, and upon making " just compensation."

Plaintiffs are the owners of certain premises, on the banks of Honeoye creek, used and occupied by them for milling purposes, and their mills are operated by the waters of the stream; said creek is a fresh-water, non-navigable stream, formed by the junction of the surplus waters of three small inland lakes; one of these, Hemlock lake, is about seven miles in length, and one-half mile in width; it is to a certain extent navigable and has for many years been navigated for local purposes by those living upon its shores.   Said lake and the lands adjoining and the plaintiffs' premises are included in the territory of which the proprietorship was ceded by this State to Massachusetts by the treaty of 1786. Under the authority of the act chapter 754, Laws of 1873, defendant constructed a conduit from the said lake to the city, for the purpose of furnishing water for the inhabitants of the city, which conduit draws from the lake 4,000,000 gallons of water daily. In an action to restrain the continued diversion of the surplus waters of the lake from said creek, *held*, that, conceding the lake was part of the navigable waters of the State and subject to all the rules pertaining to such waters, and that the State by the act aforesaid conferred upon the defendant all of the rights in the lake which remained in the State subsequent to the treaty, it imposed the same liability to those who might be injured by defendant's use of such waters as the State itself would have incurred for a similar use ; that the diversion of the waters for the purpose specified was for an object totally inconsistent with their use as a public highway or the common right of all the people to their benefits ; that the State had no right, and by the said act did not attempt to grant a right to such use to the detriment of the riparian owners upon said creek and without making compensation ; and that, as the evidence tended to show plaintiffs were injured by the diversion complained of, a dismissal of their complaint was error.

The rights of the riparian owners upon the Hudson (aside from its tidal character) and the Mohawk rivers are affected by the doctrines of the civil law, prevailing in the Netherlands from whose government

they were derived, and are distinguishable from the rights of riparian owners upon other navigable waters of the State.

*People* v. *Canal Appraisers* (33 N. Y. 461), distinguished and limited.

*Gould* v. *H. R. R. R. Co.* (6 N. Y. 522) and *People* v. *Tibbetts*( 19 id. 527), distinguished.

*It seems* that the doctrine above stated, as to the rights of riparian owners, does not apply to the vast fresh-water lakes or inland seas of this country, or to the streams forming the boundary lines of States.

(Argued April 20, 1883; decided June 5, 1883.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, entered upon an order made the second Tuesday of June, 1882, which affirmed a judgment in favor of defendant, entered upon a decision of the court on trial at Special Term.

This action was brought by plaintiffs, as owners and lessees of mills and manufactories situated upon the banks of Honeoye creek, to restrain defendant from diverting the waters of Hemlock lake from said creek.

The court found in substance these facts: Hemlock lake is a body of water situate in Livingston county, N. Y., about seven miles long and one-half mile wide. The outlet of said lake is at the northerly end of the lake, and, within a mile, it unites with the outlet of Canadice lake, which is a stream of nearly the same size. After flowing in a northerly direction about five miles, the waters of the two lakes above mentioned unite with Honeoye creek, the outlet of Honeoye lake, and these united waters flow into the Genesee river about sixteen miles above the city of Rochester. Plaintiffs severally own, or operate as lessees from the owners, mills and manufactories of various kinds, situate upon the Honeoye creek, below its junction with the waters of Hemlock lake, and operated by the waters of said creek; which mills and manufactories were so in operation for more than twenty years before the construction by the defendant of the water-works hereafter mentioned. The waters of Hemlock lake are part of the navigable waters of the State, and have actually been

navigated by citizens of the State, with scows, steamboats and other craft, for over thirty years.

An act was passed by the legislature of this State in June, 1873, entitled "An act to define and restrict the powers of the board of water commissioners of the city of Rochester" (Chap. 754, Laws of 1873), in and by the third section of which it is provided that the board of water commissioners of the city of Rochester, appointed under the provisions of act chapter 387 of the Laws of 1872, are authorized to enter upon, control and use, as the agents of the city of Rochester, the waters of Hemlock and Canadice lakes, for the purpose of procuring a water supply for the city of Rochester, and also have the power to raise the surface of the water in said lakes not to exceed two feet, and to draw down the said water below low-water mark not to exceed eight feet, also the right to take such measures and make such constructions as should be necessary to secure said waters for the purposes intended, and to protect the same from improper obstruction or pollution from any cause, and also to perform any and all acts relating thereto which may be necessary for the purposes for which the said commissioners were appointed; and in and by said third section it is further provided, that all the powers thereby granted are to be exercised with due regard to the rights of owners of property adjacent thereto or dependent thereon, and that the city of Rochester shall be liable to pay to such owners any and all damages caused to said property by the performance of said act or the exercise of the powers thereby granted. Before the passage of the last-mentioned act, an artificial channel had been constructed by other parties than defendant or its agents at the point near where the outlet from Hemlock lake commenced, the bed of which was six feet lower than the bed of the natural outlet from the lake. For many years before the passage of said law, the Hoppough mills, situate upon the outlet a short distance below the lake, had been in operation and were supplied with water from the lake, which was retained by a dam across the outlet below the junction with the outlet of Canadice lake, the crest of

which dam was two feet lower than the bed of the natural out-let of Hemlock lake at the point where the same leaves said lake. After the passage of said act the board of water commis-sioners of the defendant, claiming to act under the authority therein given, constructed a bulk-head, and placed gates therein to enable them to control the flow of water from Hemlock lake. They also laid an iron pipe of three feet internal diameter, extending from said lake ten miles to-ward the city of Rochester, where the size of the pipe was reduced to two feet interior diameter, and the same was con-tinued of that size to said city, for the purpose of conveying through the same the waters of said lake to the city of Roches-ter, and thus supply the residents thereof with pure and whole-some water. The size of such pipe will enable the defendant to draw through the same nine million gallons per day, if the wants of the city require that quantity, and the waters of Hemlock lake may be drawn through such pipe until the sur-face of the lake is reduced six feet below the bed of the natu-ral outlet thereof. It has not been necessary thus far to draw from said lake for the use of the city to the full capacity of said pipe, and for the year past the defendant has diverted from the water of said lake through said pipe four million gallons daily to the city of Rochester; but the defendant claims the right, and when the necessities of the city require the same, intends to divert the waters of said lake to said city to the full capacity of said pipes for that purpose. Defendant has used so much of the water of Hemlock lake so by it taken to the city of Rochester as was necessary for the domestic use of the inhabitants thereof for that purpose, and has allowed divers manufacturing establishments in said city to use the residue not used for domestic purposes, and has re-ceived pay from such establishments for the use thereof. The three lakes and Honeoye creek, with the lands adjoining. are located within that portion of the territory of the State of New York which was the subject of dispute between the States of New York and Massachusetts, and which is described in the compact or agreement made by the commissioners of

said States at Hartford, in the State of Connecticut, on the 16th day of December, 1786, by which said territory was ceded to Massachusetts.

As conclusions of law, the court found in substance that the people of the State were, at the time of the passage of the said act of 1873, in their sovereign capacity, the absolute owners of Hemlock lake, including the waters therein and the land under the same, and had full right at their pleasure to grant and convey the same to the defendant. That in and by said act the State granted to the board of water commissioners of the city of Rochester, and to defendant, full power to enter upon, control and use the waters of Hemlock lake for the purpose of procuring a water supply for the city of Rochester, and by virtue thereof the defendant had full power and authority and legal right to divert the waters of Hemlock lake as fully as it has diverted the same, and thereupon directed judgment dismissing the complaint.

Other facts appear in the opinion.

*Theodore Bacon* for appellants. All valid individual title to land is derived from the grant of our own local government or from the crown or royal chartered governments established here prior to the revolution. (3 Kent's Comm. 377–8; *Jackson* v. *Ingram,* 4 Johns. 163; *Jackson* v. *Waters,* 12 id. 365.) By several distinct grants the English crown had divested itself of all proprietary right, although unquestionably reserving to itself certain rights of "government, sovereignty and jurisdiction" over the territory in which the water-courses now in question are situated. (1 U. S. Charters and Const. 921–931; id. 932, 954, 257.) The Constitution adopted in 1777 confirmed the royal patents granted before the revolution. (*People* v. *Clark,* 5 Seld. 349, 360; 10 Barb. 120, 142; *People* v. *Van Rensselaer,* id. 291, 320; 2 U. S. Charters and Const. 1337–8, §§ 35, 36; 1 Greenl. 13, 31; 1 N. Y. R. S. [2d ed.] 31, 32; Stat. 1779, chap. 25, §14.) Land under the water of the streams and lakes was capable of being the subject of a grant from the sovereign; was, therefore, included in the grants from

the British crown, and confirmed to Massachusetts by the treaty of cession. And this was true of the navigable as well as the non-navigable streams and lakes. (*People* v. *Platt*, 17 Johns. 195; *Rogers* v. *Jones*, 1 Wend. 237; *Canal Appraisers* v. *Tibbits*, 17 id. 571, 609–614; *Commrs. Canal Fund* v. *Kempshall*, 26 id. 404; *Brookhaven* v. *Strong*, 60 N. Y. 56, 71–2; *Gould* v. *H. R. R. R. Co.*, 2 Seld. 522, 531–2, 534; *Burbank* v. *Fay*, 65 N. Y. 57–62; *Marshall* v. *Ulleswater Steam Nav. Co.*, 41 L. J. Q. B. 41; L. R., 7 Q. B. 166; 25 L. T. [N. S.] 793; *Bristow* v. *Cormican*, L. R., 3 App. Cas. H. L. [I.] 641, 652–3, 666–7; *S. C.*, Ir. Rep., 10 Com. L. 418; *Munson* v. *Hungerford*, 6 Barb. 263; *Ledyard* v. *Ten Eyck*, 36 id. 172; 1 R. L. 293, § 4; Laws of 1815, chap. 199; Laws of 1824, chap. 30; 1 R. S. 203, § 67.) Incident to the ownership of the soil contiguous to and under the non-navigable streams like Honeoye creek is the right to have the water of the streams flow in the channel of the stream, rendering such service as it can be made to render in passing the owner's premises. (*Ledyard* v. *Ten Eyck*, 36 Barb. 102, 124–5; *Burbank* v. *Fay*, 65 N. Y. 57, 62; 2 R. L. 289, § 15.) This right is not limited, either in character or extent, to any present or prior use by the owners of the water, but extends to any useful purpose to which it can now or may in the future be applied. (Angell on Water-Courses, §§ 90–96; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162; *Reid* v. *Gifford*, Hopk. 416; *Corning* v. *Troy Iron and Nail Factory*, 34 Barb. 485; *S. C.*, 39 id. 311; 40 N. Y. 191.) The flow to which they are entitled is the natural flow of the stream, whether more or less free even from casual obstructions, although brought in by the operation of natural processes. (Hale's Com. Law [ed. 1779], "Analysis," 96, § xlvi; *Brown* v. *Best*, 1 Wils. 174; *Hodges* v. *Raymond*, 9 Mass. 316; *Prescott* v. *White*, 21 Pick. 341; *Prescott* v. *Williams*, 5 Metc. 429; *Mayor of Lynn* v. *Turner*, Cowp. 86; Woolrych on Waters, 274–5, 281–2.) The plaintiffs' right to the flow of water by their premises is property within the meaning of that constitutional provision which forbids the taking of property without compensation; and of that which forbids the depri-

vation of property without due process of law. (*Gardner* v. *Newburgh*, 2 Johns. Ch. 162; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; *Comm'rs Canal Fund* v. *Kempshall*, 26 Wend. 404; *Colter* v. *Lewiston R. R. Co.*, 36 N. Y. 217.) Private right to the use of water upon streams is inconsistent with the public right of " government, sovereignty and jurisdiction; " is exercised, if at all, only by the sufferance of the sovereign, and may be determined by the arbitrary will of the sovereign. (Webster's Dict., sub. voc.; Bouv. Law Dict., *Ibid.*; 2 Kent's Com. 339; *Beekman* v. *S. & S. R. R. Co.*, 3 Paige, 45, 72–3.) There was in the State, for public use, a right to insist that all streams and bodies of water capable of use as highways should always be kept open for that purpose, although, for every other than the purpose of public passage, such streams and ponds might be the subject of private ownership. (*People* v. *Platt*, 17 Johns. 195; *Comm'rs* v. *Kempshall*, 26 Wend. 404; *Varick* v. *Smith*, 9 Paige, 547; *Morgan* v. *King*, 35 N. Y. 454.) The rights of the plaintiffs in this non-navigable stream are as clear and as independent of the State as any man's title to his farm can be. (*Pearsall* v. *Post*, 20 Wend. 111; *Post* v. *Pearsall*, 22 id. 425; *Lyon* v. *Fishmongers' Co.*, L. R., 1 App. Cas. 662; *Chen. Bridge Co.* v. *Paige*, 83 N. Y. 178; *Ex parte Jennings*, 6 Cow. 518; *Morgan* v. *King*, 35 N. Y. 454, 458; *Dutton* v. *Strong*, 1 Black, 23; *Yates* v. *Milwaukee*, 10 Wall. 497; *Morrill* v. *St. Anthony's Falls Water Power Co.*, 26 Minn. 222; *Simickson* v. *Johnson*, 2 Harr. [N. J.] 129; *Crittenden* v. *Wilson*, 5 Cow. 165; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166; Angell on Tide-Waters, *passim*; *In re Townsend*, 39 N. Y. 171.) The rights of some of the plaintiffs to their water privileges, granted by one State and confirmed by another, had also become established as against both States, by more than forty years adverse use. (*Comm'rs* v. *Kempshall*, 26 Wend. 404, 421; *People* v. *Clarke*, 5 Seld, 349; *Chad.* v. *Tilsed*, 2 Brod. & Bing. 403.) These rights may properly be protected by a court of equity; and the plaintiffs, having a common interest in the object of the action, and not seeking to recover damages in regard

to which their rights are entirely distinct, have properly joined in bringing it. (*Reid* v. *Gifford*, Hopk. 416 ; *Murray* v. *Hay*, 1 Barb. Ch. 59; *Brady* v. *Weeks*, 3 Barb. 157; *Fort* v. *Bronson*, 4 Lans. 47; 3 Blackst. Comm. 433–439; *Garwood* v. *N. Y. C. R. R.*, 83 N. Y. 400, 406; Kerr on Injunctions, 4–7; Angell on Water-Courses, § 449; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162; *Webb* v. *Portland Manufacturing Co.*, 3 Penn. 189; *Bonaparte* v. *C. & A. R. R. Co.*, 1 Bald. C. C. 205; *Ballou* v. *Hopkinton*, 4 Gray, 324; *Belknap* v. *Trimble*, 3 Paige, 577; *Olmsted* v. *Loomis*, 5 Seld. 423; *Corning* v. *Troy I. & N. Factory*, 34 Barb. 485; *S. C.*, 39 id. 311; *S. C.*, 40 N. Y. 191; *Crooker* v. *Bragg*, 10 Wend. 260; *Garwood* v. *N. Y. C. & H. R. R. R.*, 17 Hun, 356; *S. C.*, 83 N. Y. 400; *Lyon* v. *McLoughlin*, 32 Vt. 425; *Wilts. & Berks. Canal Nav. Co.* v. *Swindon Water-Works Co.*, L. R., 9 Ch. App. 451; L. R., 7 H. of L. 697, 714; *Acquackanonck Water Co.* v. *Watson*, 29 N. J. Eq. 366.) Chapter 754 of the Laws of 1873, under which plaintiff's rights were invaded, is void under the provisions of the Constitution. (Constitution, art. 3, § 16; art. 1, § 6; art. 1, § 7; *People* v. *O'Brien*, 38 N. Y. 193; *Fishkill* v. *Plank-road Co.*, 22 Barb. 634; *People* v. *Allen*, 42 N. Y. 404, 419; *Smith* v. *Mayor*, 34 How. Pr. 508; *People* v. *Com., etc., of Palatine*, 53 Barb. 70; *Huber* v. *People*, 49 N. Y. 133; *People* v. *Brooklyn*, 13 Abb. [N. S.] 121; *Watertown* v. *Fairbanks*, 65 N. Y. 588; *Matter of Lands in Flatbush*, 60 id. 398, 407; *Matter of Sackett, etc., Streets*, 74 id. 95, 102–103; *Ives* v. *Norris* [Nebraska], 13 N. W. Rep. 276; *White* v. *White*, 5 Barb. 474, 482–5; *Stuart* v. *Palmer*, 74 N. Y. 183; U. S. Constitution, 14th Amendment, § 1; *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 9; *People* v. *Haydon*, 6 Hill, 361; *Bohlman* v. *Green Bay R. R.*, 30 Wis. 105; Constitution U. S., art. 1, § 10; *People* v. *Platt*, 17 Johns. 195.) The defendant's acts in erecting bulk-heads, obstructing the flow of water and making reservoirs of the lakes, not for the purpose of using the water at those points, but to facilitate the diversion of it into a new channel thirty miles long, are no defense to this action. (*Clinton* v. *Myers*, 46 N. Y. 511; *Webb* v. *Portland*

*Manuf. Co.*, 3 Sumn. 189; *Gerrish* v. *N. M. Manuf. Co.*, 10 Foster, 478; *Harding* v. *Stamford Water Co.*, 41 Conn. 87.)

*William F. Cogswell* for respondent. The injury to the defendant by the granting of the relief sought being immeasurable and irreparable, involving great public interests, while the injury to the plaintiffs is one that can be compensated by money, a decree for injunction will not be granted. (*Wood* v. *Sutcliff*, 2 Simons [N. S.], 163; *Bankhart* v. *Houghton*, 27 Beav. 425; *Durell* v. *Pritchard*, L. R., 1 Ch. App. 244; Kerr on Injunction, 225, 231-2.) Defendant's structure, having been completed before the suit was commenced, the injunction prayed will not be granted, especially in view of the fact that the same was constructed without remonstrance on the part of the plaintiffs, and that their damages may be compensated by the payment of a sum of money. (*Deere* v. *Guest*, 1 M. & C. 516; *Jacomb* v. *Knight*, 32 L. J. Ch. 601; *Wickes* v. *Hunt*, Johnson [Eng. Rep.], 372; Kerr on Injunctions, 231-233.) The law in reference to the right of riparian proprietors in running streams has no applicability to the case on hand. (*Haldin* v. *Brockhart*, 45 Penn. St. 514; Angell on Water-Courses [6th ed.], § 112.) As Hemlock lake is a navigable lake, its waters belong to the State, the State had the right to take the waters thereof, or grant them to the defendant without making compensation to the plaintiffs. (*Cohn* v. *Wason Boom Co.*, Alb. L. J., Nov. 8, 1879, p. 375; *People* v. *Canal Appraisers*, 33 N. Y. 461; *Crill* v. *City of Rome*, 47 How. Pr. 398; *Morgan* v. *King*, 35 N. Y. 454; *People* v. *Tibbets*, 19 id. 523; *Gould* v. *H. R. R. R. Co.*, 2 Seld. 522; *Susq. C. Co.* v. *Wrights*, 9 W. & S. 9; 3 Kent, marg. p. 430; Angell on Water-Courses, §§ 41-43, 537, 542, note 1, 546, 550 *a;* Woolrych on Waters, 40; *Martin* v. *Waddell*, 16 Peters, 367, 410; Houck on Navigable Rivers, chap. 5, p. 78; *People* v. *Canal Appraisers*, 33 N. Y. 461; *Morgan* v. *King*, 35 id. 425; *Canal Comm'rs* v. *People*, 5 Wend. 423; *People* v. *Tibbits*, 19 N. Y. 523.) By the treaty between New York and Massachusetts of 1786, the

right of the State in the navigable waters did not pass to Massachusetts with the proprietary right to the soil, but is one of those public rights or rights of sovereignty which were ceded to and reserved by the State of New York. (*People* v. *Vanderbilt*, 26 N. Y. 287–292 ; 38 Barb. 286 ; *Williams* v. *Wilcox*, 3 N. & P. 606 ; *Lansing* v. *Smith*, 4 Wend. 9, 20.)

Ruger, Ch. J.　The State by virtue of its sovereignty is deemed the original grantor of all titles to real estate, and a conveyance by it of riparian rights upon non-navigable streams vests its grantees, both mediate and remote, with all the rights which such owners can acquire against any grantor.

The riparian owners of lands adjoining fresh water, non-navigable streams, take title, "*ad usque filum aquæ,*" to the thread of the stream, and thereby acquire the right as incident to such title to the usufructuary enjoyment of the undiminished and undisturbed flow of such water. "Fresh rivers of what kind soever do of common right belong to the owners of the soil adjacent," is the expressive language of the common law and is of universal application. (*Clinton* v. *Myers*, 46 N. Y. 511 ; 7 Am. Rep. 373 ; *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178 ; 38 Am. Rep. 407.)

The plaintiffs have shown title to the several premises occupied and enjoyed by them as mill-owners upon the banks of a non-navigable stream, which entitles them to the uninterrupted flow of its waters in the channel of the stream contiguous to their respective premises as it had been accustomed to flow. (*Gardner* v. *Vil. of Newburgh*, 2 Johns. Ch. 162 ; *Reid* v. *Gifford*, Hopk. 416 ; *Brown* v. *Bowen*, 30 N. Y. 519 ; *Pixley* v. *Clark*, 35 id. 520 ; *Varick* v. *Smith*, 5 Paige, 137.)　Their right to maintain an action to restrain the infringement of any rights of property which they possess as riparian owners is unquestionable. (*Gardner* v. *Vil. of Newburgh*, *supra* ; *Corning* v. *Troy Iron and Nail Factory*, 40 N. Y. 191 ; *The West Point Iron Co.* v. *Reymert*, 45 id. 703 ; *Garwood* v. *N. Y. C. & H. R. R. R. Co.*, 83 id. 404 ; *Yates* v. *Milwaukee*, 10 Wall. 504.)

Honeoye creek, upon which the mill privileges of the sev-

eral plaintiffs are situated, is a fresh-water, non-navigable stream, formed by the junction of the surplus waters of the Hemlock, Canadice and Honeoye lakes flowing through their respective outlets and affords valuable water privileges, which have been used and enjoyed by the respective owners of lands on the creek for a long series of years. It is not claimed that the creek was ever made a public highway, or that it is capable of navigation, neither is it denied that the riparian proprietors own the bed of the stream. It necessarily follows that such owners possess all the rights in the running water of this stream that belong to the riparian owners of any stream or water-course.

This action is brought to restrain the continued diversion by the defendant of the surplus water of Hemlock lake from this creek, such diversion being effected by means of a conduit constructed by the city of Rochester from the lake to the city, and which now draws from the lake four million gallons of water and has the capacity for carrying upward of nine million gallons daily. The conduit was constructed about the year 1875 for the purpose of furnishing for the use of the citizens of Rochester a supply of water for domestic and other purposes, and was authorized by chapter 754 of the Laws of 1873.

The defense proceeds upon the theory that Hemlock lake being a navigable body of water, as such with its bed belongs to the State, and that the State possessed the consequent right of authorizing the appropriation of the water by its agents or grantees for any public use without regard to the rights of individuals who may have previously acquired proprietary interests therein.

The proofs and the finding of the court below establish that this lake was to a certain extent navigable, and that for many years it had in a limited way and for local purposes been actually navigated by those living upon its shores. It was a small inland lake, about seven miles in length and one-half mile in width, lying about thirty miles south-easterly from Rochester. It may be assumed, then, that this lake formed a portion of the navi-

gable waters of the State, and was, therefore, subject to all of the rules pertaining to such waters, and further, that the State conferred upon the defendant all of the rights in the lake which remained in it, subsequent to the original grant of the lands on Honeoye creek. Section 3 of chapter 754 of the Laws of 1873, under authority of which said conduit was built, reads as follows: " The board of water commissioners of the city of Rochester appointed under the provisions of act chapter 387 of the Laws of 1872 are hereby authorized to enter upon, control and use as the agents of the city of Rochester the waters of Hemlock and Canadice lakes, situated in the county of Livingston, for the purpose of procuring a water supply for the said city of Rochester, and shall also have the power to raise the surface of water in said lakes, not to exceed two feet, and to draw down the said water below low-water mark not to exceed eight feet; also, the right to take such measures and make such constructions as shall be necessary to secure said waters for the purposes intended." "All of the above powers hereby granted to be exercised with due regard to the rights of owners of property adjacent thereto and dependent thereon. And the city of Rochester shall be liable to pay to such owners any and all damages which may be caused to such property by the performance of said act or the exercise of the powers hereby granted." This act does not infringe any constitutional provision and was enacted in substantial conformity with the requirements of the fundamental law.

The provision quoted undoubtedly grants to the city of Rochester the right to make such use of the waters of the lake as the State itself might have made and imposes with it the same liability to those who might be injured by its use of such waters as the State itself would have incurred for a similar use.

It seemed to be assumed upon the argument that the rights of the State in the waters of Hemlock lake depended upon the ownership of the soil under its bed, and the question whether the title of riparian owners by the rules of common law in

cluded the land to the center of the bed of the adjoining navigable-body, or was restricted to the water's edge. We do not think this is necessarily so, but conceding the claim for the present let us examine that position. This question has occasioned some diversity of opinion in this country and has led to conflicting and apparently irreconcilable decisions in our courts. It would be a vain and useless effort to attempt to harmonize the divergent views on the subject, but we believe that a doctrine may be evolved from the authorities which will accord with the great weight of judicial opinion in this country, and still preserve such property rights as have been acquired and have grown up under the authority of diverse decisions. We have arrived at the conclusion that all rights of property to the soil under the waters of Hemlock lake were acquired by and belong to its riparian owners, while such rights only over its waters belong to the State as pertain to sovereignty alone.

The ownership and jurisdiction over the lands in the southwestern part of the State in which Hemlock lake is located, were, in the earlier history of this country, the subject of much controversy between the sovereign States of Massachusetts and New York. These differences were finally adjusted by a treaty executed between the respective States, in December, 1786, whereby the State of New York did " cede, grant, release and confirm to the said Commomwealth of Massachusetts, and to the use of the Commonwealth, their grantees and the heirs and assignees of such grantees forever, the right of pre-emption of the soil from the native Indians, and all other the estate, right, title and property (the right and title of government sovereignty and jurisdiction excepted), which the State of New York hath, of, in or to " the lands in question; on the other hand, the State of Massachusetts ceded to New York all claim to the government, sovereignty and jurisdiction of the lands described.

Subsequent to this treaty there remained in the State of New York only such rights of property in these lands as necessarily pertained to its sovereignty and were inalienable by the sovereign. All such rights of property in or to the territory in

dispute as could by the most comprehensive and absolute convey-ance be granted to another were, by this treaty, conferred upon the Commonwealth of Massachusetts and its grantees. (*Bur-bank* v. *Fay*, 65 N. Y. 57; *Commr's of Canal Fund* v. *Kempshall*, 26 Wend. 404.) The settlers in this territory derive the title to their lands from the Commonwealth of Massachusetts and have become possessed of all of the rights which that State acquired in such lands by virtue of the treaty of cession or otherwise.

It now remains to consider the nature of the rights of prop-erty which pertain exclusively to sovereignty and which do not pass to the grantee under a conveyance of the soil border-ing upon and adjoining fresh-water navigable lakes and rivers. It may be premised that the mere right of eminent domain always and from necessity resides in the sovereign. It is de-clared by statute that the State, by virtue of its sovereignty, is deemed to possess the original and ultimate property in and to all lands within the jurisdiction of the State. (3 R. S. [7th ed.] 2162, § 1; *People* v. *Fulton F. Ins. Co.*, 25 Wend. 219; *People* v. *Denison*, 17 id. 312; *De Peyster* v. *Michael*, 6 N. Y. 467; *People* v. *Van Rensselaer*, 9 id. 319.) This right confers upon the State the title to such property as may be forfeited or escheated, or the title to which for any reason fails, and also the right to resume the ownership and possession of such property as may be required or rendered necessary for public purposes. (*Varick* v. *Smith*, 5 Paige, 143, 159; *Matter of Albany St.*, 11 Wend. 149; *Morgan* v. *King*, 35 N. Y. 454.) Among other rights which pertain to sovereignty is that of using, regulating and controlling for special purposes the waters of all navigable lakes or streams, whether fresh or salt, and without regard to the ownership of the soil beneath the water. This right is known as the *jus publici* and is deemed to be in-alienable.

Judge EDMONDS, in his learned opinion in *Gould* v. *Hudson River Railroad Co.* (6 N. Y. 546), says: " When regarding the rights of the State in respect to lands, we must not be un-mindful that it has two interests, one governmental and the

other proprietary. Or as it is divided by M. Prudhon in his *Traité du Domain Public*, the public domain, which is that kind of property which the government holds as mere trustee for the use of the public, such as public highways, navigable rivers, salt springs, etc., and which are not, of course, alienable; and the domain of the State, which applies only to things in which the State has the same absolute property as an individual would have in like cases." Although this quotation is from a dissenting opinion, yet, so far as the principle announced is concerned, it met with no dissent and is supported by universal authority. (6 N. Y. 555; *U. S. B'k* v. *B'k of Metropolis*, 15 Pet. 387; *Doe dem Knight* v. *Nepean*, 5 B. & A. 91; *Hoyt* v. *Sprague*, 12 Pick. 407; 3 Kent's Com. 537; *Pollard's Lessee* v. *Hagan*, 3 How. [U. S.] 222.)

In the examination of any of the numerous questions relating to water-courses that may arise, no discussion would be complete which failed to refer to the ancient and learned treatise *De jure Maris*, by Sir Matthew Hale, and which, after the lapse of two centuries, remains the most concise, comprehensive and reliable work on the subject of which it treats. As appears from the learned note of Judge COWEN to *Ex parte Jennings* (6 Cow. 537), under the following title "Of the right of prerogative in private or fresh rivers," it reads: "The king, by an ancient right of prerogative, hath had a certain interest in many fresh rivers, even where the sea does not flow or reflow, as well as salt or arms of the sea, and those are these which follow:

"1st. A right of franchise or privilege that no man may set up a common ferry for all passengers, without prescription time out of mind or a charter from the king.

"2d. An interest as I may call it of pleasure or recreation.

"3d. An interest of jurisdiction.

"And another part of the king's jurisdiction in reformation of nuisances is to reform and punish nuisances in all rivers, whether fresh or salt, that are a common passage not only for ships and greater vessels, but also of smaller as barges and boats, to reform the obstructions or annoyances that are therein to such

common passage for as the common highways on the land are for the common-land passage, so these kind of rivers, whether fresh or salt, that bear boats or barges are highways by water, and as the highways by land are called *altæ viæ regiæ,* so these public rivers for public passage are called *fluvie regales* and *streomes le Roy,* not in reference to the propriety of the river but to the public use."

The doctrines of this treatise so far as relate to the jurisdiction of the sovereign over navigable waters, have been frequently cited with approval in our reports and are now indisputable. (*People* v. *Platt,* 17 Johns. 210; *Hooker* v. *Cummings,* 20 id. 100; *Commissioners* v. *Kempshall, supra; Canal Appraisers* v. *People,* 17 Wend. 570.)

The rule of common law is concisely stated in the note above referred to as follows : " Rivers not navigable, that is, fresh rivers of what kind soever, do of common right belong to the owners of the soil adjacent to the extent of their land in length. But salt rivers, where the tide ebbs and flows, belong of common right to the State. That this ownership of the citizen is of the whole river, viz., the soil and the water of the river, except that in his river where boats, rafts, etc., may be floated to market, the public have a right of way or easement."

It may, however, be stated in passing, that it is generally conceded that this doctrine is inapplicable to the vast freshwater lakes or inland seas of this country or the streams forming the boundary line of States. (*Canal Commissioners* v. *People,* 5 Wend. 446; *Tibbetts Case, supra.*) Whatever conclusion may, therefore, be reached with reference to the ownership of the bed of Hemlock lake, it still remains that the State had certain rights in its waters and so far as the same were alienable the defendant has succeeded to them. It may, also, be affirmed that if the term " navigable water " as used in England was ever there for any purpose wholly restricted to the waters which were affected by the ebb and flow of the tide, it has by common consent a more enlarged signification in this country and is here held to mean all such waters as are actually naviga-

ble, whether fresh or salt. When it is considered that the rights and interests of the public, such as fishing, ferrying and transportation, are preserved in all navigable waters by the inherent and inalienable attributes of the sovereign, it would seem to follow that the controversies which have arisen over the nominal ownership of the soil under such waters have been magnified beyond the real interests involved. This becomes still more apparent when we consider the character and extent of the property which may in the nature of things be acquired and enjoyed in running water. *"Aqua curret debet currere."* Neither sovereign nor subject can have any greater than a usufructuary right therein, and even this is subject to the temporary enjoyment by the riparian proprietors over whose lands it passes while on its way to its final destination, undiverted and undiminished, save for domestic or manufacturing purposes. (3 Kent's Com. 439 ; *Tyler* v. *Wilkinson*, 4 Mason, 397.) Thus all land covered by running water is subject to a servitude, either dominant or servient, and all interest in such water is simply an easement, incapable of fixed appropriation or conversion. (1 Stephens' Blackst. 169 ; Washb. on Easements, 200.) The rule of the common law of England has been uniformly deemed to apply in this country to the affluents of all navigable waters as well as to all those which are non-navigable, and the only serious controversy arises over its application to its inferior fresh-water navigable streams and lakes. These rules were made the fundamental law of this State by its original Constitution and have been readopted upon every subsequent revision of that instrument.

Section 25 of the Constitution of 1877 reads : " And this convention in the name and by the authority of the good people of this State ordain, determine and declare that such parts of the common law of England and of the statute law of England and Great Britain and of the acts of the legislature of the colony of New York as together did form the law of the said colony on the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, shall be and continue the law of this State, subject to such alterations and pro-

visions as the legislature of this State shall from time to time make concerning the same." (§ 13, art. 7, Const. of 1821; § 17, art. 1, Laws of 1846.)

It is not claimed that the legislature has ever changed or modified the common-law rules on the subject under consideration by express legislation or direct action looking to their limitation. The only grounds for a denial of their application to the subject in this country is on account of their alleged inapplicability to the larger bodies of water possessed by our people and the action of the legislature in assuming the ownership of the lands under the waters of the Mohawk and the Hudson rivers above tide-water. (Davies, J., opinion, *People v. Canal App.*, 33 N. Y. 478.)

Peculiar reasons have governed the action of the State as to the lands under the Mohawk and Hudson rivers as we shall see hereafter. We do not think the reasons given justify the court in disregarding the positive requirements of the fundamental law to the extent claimed by some of the cases. In addition to the apparently conclusive force of the constitutional provision, we also think the decided preponderance of judicial authority in the State favors the application of the common-law rule to the navigable waters of this State. It would be unprofitable to go into an extended discussion or citation of the numerous cases treating of this question, and, therefore, but few of them will be referred to and those only in our State which illustrate the views commending themselves most strongly to our judgment. (*People* v. *Platt*, 17 Johns. 195; *Hooker* v. *Cummings*, 20 id. 90; *Rogers* v. *Jones*, 5 Wend. 237; *Commissioners* v. *Kempshall*, 26 id. 404; *Ex parte Jennings*, 6 Cow. 518; *Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522; *Trustees of Brookhaven* v. *Strong*, 60 id. 56; *Chenango Bridge Co.* v. *Paige*, 83 id. 178; 38 Am. Rep. 407.) These decisions show a course of authority extending from an early period of our history to the most recent times, and although they do not constitute an unbroken chain, yet they are fortified by a wealth of learning, reason and illustration that render them irresistible as authority.

We can hardly omit to refer particularly to the learned note by Judge COWEN in *Ex parte Jennings*, the opinion of Judge EDWARDS in *Gould* v. *H. R. R. R. Co.*, and that of Senator VERPLANCK in the *Kempshall Case*. Neither is it deemed necessary to refer to all of the cases which apparently sustain conflicting views upon this question. These cases nearly all relate to the river Hudson above tide-water and to the Mohawk, and the remarks made with reference to one, therefore, apply to all. Undoubtedly the leading case on that side in our courts is *The People* v. *Canal App.* (33 N. Y. 461), in which the late Judge DAVIES delivered a learned and elaborate opinion. The head-note shows precisely the questions there involved and the extent of the doctrine announced : " The Mohawk river is a navigable stream, and the title to the bed of the river is in the people of the State. Riparian owners along the stream are not entitled to damages for any diversion or use of the waters of the Mohawk by the State."

It will be observed that the case relates to the Mohawk river and an appropriation of its water for the purpose of navigation alone — that being one of the uses which universally pertain to the rights of the sovereign in all navigable streams. The case is not, therefore, an authority for the appropriation of navigable waters for other public uses. We think this and similar cases might properly have been decided for reasons peculiar to the Mohawk and Hudson rivers upon the grounds stated in the *Commissioners* v. *Kempshall* (*supra*), by Senator VERPLANCK and by the chancellor and Senator BEARDSLEY in *Canal Appraisers* v. *People* (17 Wend. 572). The titles granted to the original settlers in the Hudson and Mohawk valleys, as construed by the rules of the civil law prevailing in the Netherlands, from whose government they were derived, did not convey to their riparian owners the banks or beds of navigable streams. Upon the surrender of this territory the guaranty assured by the English authorities to its inhabitants of the peaceable enjoyment of their possessions simply confirmed the right already possessed, and the beds of navigable streams, never having been conveyed, became, by virtue of the

right of eminent domain, vested in the English government as ungranted lands, and the State of New York, as a consequence of the Revolution, succeeded to the rights of the mother country.

As to the lands under these rivers, the people of this State have, from the earliest times, asserted their title, however acquired, and have assumed to grant and convey them like other unappropriated lands belonging to the State. (3 Greenl. Laws, 13 [Dec., 1792]; *Palmer* v. *Mulligan*, 3 Caines, 308.) It is stated in *People* v. *Canal Appraisers* (*supra*), that when the possession of these waters subsequently became necessary to the State for the purposes of navigation, they reacquired the rights formerly granted by them from the Western Inland Navigation Company by purchase, and they then appropriated them by virtue of their original proprietorship. We think the authority of these cases should be confined to the waters of the Hudson and Mohawk rivers, rights in which were alone necessarily involved in their determination. However this may be, we are clearly of the opinion that Hemlock lake is not such a body of water as under any rule entitles the State to claim the ownership of its bed, and that the only rights, if any, which the defendant acquired by virtue of chapter 754 of the Laws of 1873 were those which the State possessed by virtue of its sovereignty over the territory in question. Those rights are quite distinct from such as the State would have possessed as a riparian owner. Such rights would have entitled her to the same uses and subject to the same liabilities as other owners of property. (*People* v. *Vanderbilt*, 26 N. Y. 292; *Commissioners* v. *Kempshall*, *supra*.) We have before seen that the sovereign right grew out of and was based upon the public benefits in promoting trade and commerce, supposed to be derived from keeping open navigable bodies of water as public highways for the common use of the people.

We have also seen that they constituted an easement over the lands of the riparian owners for limited purposes, and embracing no right to convert the waters to any other uses than those for which the easement was created. It is an element-

ary principle that all easements are limited to the very pur-
pose for which they were created, and their enjoyment cannot
be extended by implication. This right, being founded upon
the public benefit supposed to be derived from their use as
a highway, cannot be extended to a different purpose incon-
sistent with its original use. The diversion of these waters
for the purposes of furnishing the inhabitants of a large city
with that element for domestic uses, and especially to lease
them for manufacturing and other purposes, is an object totally
inconsistent with their use as a public highway or the common
right of all the people to their benefits.

We concede that such a use is a public one in the sense that
enables a municipal corporation to procure the lawful condem-
nation of property for that object, but we deny that it is con-
sistent with the purpose upon which the sovereign right is
based.

The exercise by a ruler of the right of eminent domain is al-
ways subject to the obligation of making compensation for the
property taken. (*Gould* v. *Hudson River R. R.*, *supra*.)
Due regard for the distinctions existing between a public
right and a public use, and also those between a sovereign
and a proprietary right is essential to a just consideration
of the rights of parties in navigable water-courses. While a
sovereign may convey its proprietary rights, it cannot alienate
its control over navigable waters without abdicating its sover-
eignty. (*Martin* v. *Waddell*, 16 Peters, 367.) A neglect to
observe these distinctions has been the cause of much error in
treating of these rights.

In *Comm'rs* v. *Kempshall*, Senator VERPLANCK says: "I
cannot assent to the position that the conceded common-law
authority of the State over such rivers, for the purposes of
navigation, comprehends the right to divert the waters to other
purposes of artificial navigation, wholly distinct from that of
the river itself." He then proceeds to state rules in apt and
pertinent language, which we consider decisive of this case in
its various aspects. "The proprietor of the bed and bank of
the stream has himself no absolute property in the waters, but

strictly a usufructuary interest appurtenant to his freehold. He can use the waters for his own benefit; but he may not divert them to the injury of his neighbors, or lessen their quantity, or detain them unreasonably. If such be the strict limitation of the proprietary right, can it be that the State, as the trustee of a special public servitude, has a much less restricted right, and can divert or detain the waters for other uses? By its sovereign right of eminent domain, it undoubtedly may do so," * * * * " but all these exercises of sovereign authority are alike ' the taking of private property for public use,' which the Constitution pronounces may not be done ' without just compensation.' "

It is said by the court in *Ex parte Jennings*, that "individual property cannot be taken, or which is the same thing, individual rights impaired for the benefit of the public without just compensation."

" The public right is one of passage and nothing more, as in a common highway. It is called by the cases an easement, and the proprietor of the adjoining land has a right to use the land and water of the river in any way not inconsistent with this easement. If he make any erection rendering the passage of boats, etc., inconvenient or unsafe, he is guilty of a nuisance, and this is the only restriction which the law imposes upon him. It follows that neither the State nor any individual have a right to divert the stream, or render it less useful or valuable to the owner of the soil."

It was also said by Judge EARL in the *Chenango Bridge Case, supra:* " The legislature, except under the power of eminent domain, upon making compensation can interfere with such streams only for the purpose of regulating, preserving and protecting the public easement. Further than that it has no more power over the fresh-water streams than over other private property." (See, also, *Morgan* v. *King*, 35 N. Y. 457; *Hooker* v. *Cummings*, 20 Johns. 99; *Gardner* v. *Village of Newburgh, supra.*)

The case of *Gould* v. *The Hudson River R. R. Co.* (6 N. Y. 522) has been cited as holding a contrary doctrine, but we

do not so regard it. The question there related solely to the ownership of the lands between low and high-water mark on the Hudson river. This was at the point in dispute, a tidal river, and by the conceded doctrine of the common law the titles of its riparian owners were bounded by the line of high-water mark. The property there taken for a public use was acquired from the State, who was its lawful owner (see *Gould Case*, p. 539).

The case of *People* v. *Tibbetts* (19 N. Y. 527) also involved the rights of riparian owners upon the Hudson river, and was put upon the express ground that by the common law the State was the owner of the bed and waters of that stream so far as the tide ebbed and flowed.

These cases, therefore, cannot be considered as authority upon the question here presented. We are, therefore, of the opinion not only that the State had no right to grant to the city of Rochester the use of the waters of Hemlock lake, to the detriment of the riparian owners upon the banks of the stream formed by its outlet, but that their rights were recognized and provided for by the act under which the defendant assumes to justify its acts.

Evidence was given to support the theory that the improvements made by the defendant in the outlets of Canadice and Hemlock lakes furnished a more uniform and constant supply of water to the plaintiff's mills than before existed. It was claimed from this fact that they were, therefore, uninjured by the alleged diversion of water. No express finding upon this issue was made by the court below, and no grounds for its consideration here are now presented. The evidence upon the issue was conflicting, and we have no means of determining the question of fact involved.

Upon proceedings being taken to condemn this property by the city of Rochester, such a consideration would have great weight in determining the extent of the injuries to the plaintiffs' property, occasioned by an unlawful interference with their water privileges, and it might bear also upon the question of the propriety of an injunction herein, but it is altogether, in

its present aspect, a question for the consideration of the court below.

The evidence in this case tended to show that the plaintiffs were injured by the act of the defendant in diverting the water of Honeoye creek, which had theretofore been accustomed to flow in its channel to the benefit of the mill-owners on that stream. This court must assume that some damage occurred to the parties who were illegally deprived of their property. The extent of this injury has not been tried and determined. We cannot look into the evidence to determine that question. That is exclusively a question for the consideration of the trial court. It is enough that the plaintiffs have a clear legal right which has been invaded, and the right to try the question of the extent of their injury has been denied them. It is possible that, upon all the circumstances of the case, the court below may, in the exercise of their discretion, deny a remedy by injunction, or grant it upon terms and conditions such as in their judgment will best preserve the rights and interests of the parties. But the plaintiffs have an undoubted right to the exercise of such discretion by that court. This has been refused them, and for that reason a new trial must be ordered.

The judgments of the General and Special Terms should, therefore, be reversed and a new trial granted.

All concur.

Judgments reversed.