ant, to have been determined by him in her favor, we find that the evidence offered on her behalf is ample to sustain the judgment.

From the written receipts produced by the defendant, given to her when she paid her rent monthly, down to the year 1893, it appears that the letting was by the month, each receipt specifying, "Rented for one month only." It was claimed by plaintiff that receipts given by his agent in 1895 and subsequently contained no such statement, but were general in form. It was not claimed that those receipts specified any term, and, as defendant continued to pay her rent monthly, in the absence of a new agreement, and she denied any new agreement, the facts support a finding that the original arrangement for a monthly tenancy continued.

Defendant testified that plaintiff's agent told her in November, 1896, when she asked for a reduction of rent, that, if she did not like it, she could leave, which was satisfactory evidence, if believed by the justice, that the defendant was not then a yearly tenant. If there were a continuing arrangement for a monthly hiring, the fact that the tenant remained over May 1st in any year did not bring the case within the New York statute, which operates only where no term is fixed by agreement.

The admission in evidence of the receipts given by former landlords of the premises to the defendant was proper to show the original hiring and its continuance. Conversations with former agents were competent for the same purpose, as the hiring was through such agents and the agent of the plaintiff, and not with the landlords directly. There was some attempt to show surrender, but it failed, and as it showed, on the contrary, that there was no acceptance, plaintiff was not harmed by it, but benefited. The retention of the key by plaintiff, after it was refused by the landlord's agent, after defendant had vacated the premises, did not constitute a continuance of the tenancy.

Judgment affirmed, with costs. All concur.

---

(20 App. Div. 177.)

HAZELTON v. WEBSTER et al.

(Supreme Court, Appellate Division, Fourth Department. July 29, 1897.)

1. RIPARIAN RIGHTS—GRANTS—CONSTRUCTION.

Where riparian owners, on an inland, nonnavigable lake, granted to a mill owner the right to flow their lands by means of a dam in the outlet of such lake, in order to raise the water for the purpose of propelling his machinery, they retained the right to use the waters, and to cut and remove ice forming on the lake, in such reasonable manner as not to injure the lower proprietors.

2. GRANT OR LICENSE—DETERMINATION.

Plaintiff's grantor, owning a mill on the outlet of a lake on which defendants were riparian proprietors, sued to restrain defendants from damaging him by the removal of ice from such lake, and, in settlement of such controversy, granted to defendants the unrestricted right to cut and remove ice from such lake, and released them from all damages which he had sustained or might sustain by reason of their interference with the water flowing to his mill, in consideration of the payment of specified sums. *Held*, a grant of whatever rights such mill owner had in the waters of the lake, and that defendants might cut and remove ice in unlimited quantities, though in doing so they should destroy the mill privilege.

**3. SAME—ACCEPTANCE—EFFECT.**

By accepting the grant, defendants did not recognize the grantor's right to ice forming on the lake. They admitted merely that they had been taking ice in unreasonable quantities, as against the grantor's milling privileges.

**4. CONTRACTS—PRACTICAL CONSTRUCTION.**

Where a contract, purporting to grant the "unrestricted" right to cut and remove ice from a lake, provided that nothing therein contained should be deemed to grant the "exclusive" right to do so, it was relieved of uncertainty by the fact that the grantees proceeded to cut and remove ice without any restriction as to quantity, with the apparent acquiescence of the grantor.

**5. SAME—CONSIDERATION—COMPROMISE.**

A contract executed in settlement of a disputed claim in suit is supported by a consideration.

Appeal from special term, Cattaraugus county.

Action by Benjamin F. Hazelton against Ellis Webster and others, constituting the firm of E. Webster, Son & Co. From a judgment dismissing the complaint on the merits, plaintiff appeals. Affirmed.

The controversy involved in this action arises out of conflicting claims to the ice forming upon a small body of water in Cattaraugus county, commonly known as "Lime Lake." This lake covers an area of about 135 acres. It is fed by subterranean springs, is without current, and nonnavigable; but its waters are especially pure, and for that reason the ice which they produce is exceedingly valuable, and finds a ready market. Prior to 1831 a sawmill was erected, and a dam constructed, upon what is known as the "Mill Lot," which contains about three acres of land. This lot, which is now owned by the plaintiff, is located upon the outlet near the north end of the lake, and was originally owned by the Holland Land Company, that company being the common source of title of all the lands covered by and adjacent to Lime Lake. In the year 1831 the milldam was washed away, in consequence of which the waters of the lake receded to such an extent that they covered only about one-third of the present area. The following year, Bela H. Colgrove and Nathan Follett, who were then in possession of the mill lot and adjoining premises, rebuilt the dam, increasing its height two feet above that of the original structure, the effect of which was to raise the water in the lake about eleven feet. Thereafter, and on the 24th day of December, 1834, the Holland Land Company, by an ordinary warranty deed, conveyed a tract of about 33 acres of land to Bela H. Colgrove; and this tract included the mill lot and the building and dam located thereon, but it did not include, nor did the deed pretend to convey, any portion of the bed of the lake, or of the waters thereof. The plaintiff, through mesne conveyances, finally acquired title to the mill lot and several other small parcels of land adjacent thereto, amounting in all to some seven or eight acres; his immediate predecessor in title being John E. Euchner, who had previously acquired the privilege of flowing the lands adjoining the lake under certain grants executed by the respective riparian owners to Colgrove and Follett. The defendants, Webster, Germann, and Banks, were originally co-partners in the business of cutting ice from Lime Lake, and selling the same in considerable quantities to their customers. In order to carry on this business, they became the purchasers of nearly all the lands adjoining Lime Lake on its easterly shore, and upon these premises they erected one or more ice houses and such other appurtenances as were necessary for harvesting and storing ice.

In 1890, John E. Euchner brought an action to restrain the defendants above named from removing ice from the lake. This action, however, was thereafter compromised and settled, and, as a result of that settlement, the parties thereto, together with Mrs. Euchner, entered into the following written agreement, which they executed under their respective hands and seals, viz.: "Articles of agreement, made and entered into this 29th day of October, 1890, by and between John E. Euchner and Grace W., his wife, of the town of Machias, in the county of Cattaraugus and state of New York, of the first part, and Ellis Webster, Edward H. Webster, William Germann, and Levi P. Banks, as and composing the firm of 'E. Webster, Son & Co.,' of the city of Buffalo, county of Erie, and state of New York, of the second part, witnesseth: For and in consideration of

the covenants and agreements hereinafter contained, the said John E. Euchner hereby covenants and agrees to sell and convey, and does hereby grant, release, and convey, unto the parties of the second part, all of his right, title, and interest to and in the strip of land lying and situate on the easterly side of Lime Lake, in the town of Machias, aforesaid, and which is adjacent on the west to the farm owned by the parties of the second part herein, and also to permit, grant, release, transfer, and assign to them, the said parties of the second part, the unrestricted right, privilege, and permission to cut, take, and remove from said lake at any time the ice forming thereon, so far as he is the owner and vested with any title to such ice or right to cut and remove the same, and releases to the said parties of the second part hereto any damages that he has sustained or may hereafter sustain by reason of diminishing the water supply for his mill at the outlet of said lake, and further covenants and agrees to maintain the dam on his premises at said outlet, and which causes the water in a measure to accumulate, thus increasing the quantity of water therein, and also agrees not to lower the mill race from said lake, or reduce the head of said water more than two feet below what it has been maintained and kept up since his ownership thereof; and the said Grace W. Euchner joins in the execution of this instrument, for the purpose of releasing and relinquishing to the parties of the second part her inchoate dower interest in said lands and premises, and does, as part consideration hereof, release and relinquish such dower interest therein. And the said parties of the first part further agree that in furtherance of this agreement, and if requested by the parties of the second part to make the title and rights of the parties of the second part more effectual and secure, will at any time execute a deed of conveyance, conformably to this contract, conveying to them, the said parties of the second part, or their assigns, the said lands and rights in said ice, as aforesaid, so far as the said John E. Euchner has the title and right to convey the same. In consideration whereof, the parties of the second part hereby covenant and agree to and with the said John E. Euchner, his heirs, executors, and assigns, to pay him one-half cent for each ton of ice hereafter taken by them from said lake. For the purpose of ascertaining and determining the quantities of ice so taken from time to time, the weights of the railroad company or companies at Machias, over whose tracks said ice is shipped, are to be accepted and received by the parties hereto as the exact amounts so taken. Said ice to be paid for, on such statements, at the said rate of one-half cent per ton annually on the first day of January hereafter. Each of said payments is to cover and include the entire shipments of ice for the year immediately preceding such payment. The parties of the second part further agree, as part consideration hereof, that they will, within thirty days from the date hereof, furnish to said Euchner an accurate statement of all the ice shipped by them from said lake since January 1st, 1889, and pay him therefor at the rate aforesaid within said thirty days. This agreement is to bind the heirs, executors, administrators, and assigns of all the parties hereto. It is understood and agreed between the parties hereto that nothing herein contained shall be deemed to grant the exclusive right to the parties of the second part to cut, take, and remove ice from said lake; nor shall anything herein contained in any way effect any claims or damages which the parties of the first part may have at any time against any persons other than the parties of the second part. It is further understood and agreed that the grant herein contained of the strip of land above mentioned shall not in any manner affect the existing right of flowage which the parties of the first part have, and that the deed above provided for shall contain a proper clause reserving such right of flowage to the parties of the first part. In witness whereof, the parties have hereunto set their hands and seals, the day and year above written." This instrument was duly acknowledged by the several parties thereto, and was subsequently recorded in the clerk's office of Cattaraugus county. Thereafter the defendant "E. Webster, Son & Co." was duly organized as a corporation under the laws of this state, and, as such, succeeded to all the right, title, and interest which the former firm had acquired in the lands adjoining the lake, as well as in the ice forming thereon. The company thereupon proceeded to enlarge its plant, and increase its facilities for harvesting, storing, and selling ice, to such an extent that the present capacity of the plant is about 150,000 tons per season. On the 13th of September, 1894, Euchner and wife conveyed the mill lot to the plaintiff, including all the right which they owned to flow the lands adjoining the lake. But this grant was,

by express terms, made subject to the agreement entered into between the grantors and the defendants. Intermediate the date of the execution of this agreement and the conveyance to the plaintiff, the defendants cut and removed ice from the lake at different times, and in such quantities as they saw fit, without objection or remonstrance from Euchner, although the cutting of ice in such largely increased quantities had a tendency to diminish the supply of water in the lake, and to some extent, at least, to impair the value of the mill property. Soon after acquiring title, the plaintiff notified the defendants that he claimed the ice upon the lake, and that they must refrain from cutting the same; but, as the defendants declined to recognize the validity of the plaintiff's claim, he brought this action to enjoin the defendants from any further interference with his supposed rights.

Argued before HARDIN, P. J., and ADAMS, GREEN, and WARD, JJ.

John Houston Merrill and Edwin E. Tait, for appellant.
Augustus Becker, for respondents.

ADAMS, J. The facts of this case, which have been necessarily stated with considerable detail, are, in the main, such as were found by the learned trial court. None of them have been excepted to by the plaintiff, and they must consequently, for the purposes of this appeal, be regarded as established. Some additional circumstances were made to appear upon the trial which were probably sufficient to justify the plaintiff in invoking the aid of a court of equity, provided he can maintain his contention that the defendants, in cutting and removing the ice from Lime Lake, were invading his legal rights, and were in fact trespassers. Proceeding, therefore, to a consideration of the case from a legal point of view, we discover that the plaintiff rests his contention upon the following propositions, viz.: (1) That he acquired an absolute and unqualified right of ownership in the ice forming in the lake, through the purchase by his predecessors of the right to flow the lands of the riparian owners; (2) that the agreement of October 29, 1890, was void, because wholly without consideration; and (3) that, by accepting and acting under the right or license granted under this agreement, the defendants were estopped from denying the plaintiff's title to the ice.

As introductory to the examination of these propositions, it may be profitable to determine what would be the relative interests of these parties in the subject-matter of the action if the same were in no wise affected by the respective grants under which each claims the exclusive right to the ice. To accomplish this, it seems only necessary to refer to the fact that the defendants are riparian owners, while the plaintiff is not, in consequence of which, Lime Lake being an inland and nonnavigable body of water, the presumption arises that, unless restricted by some reservation in their deed, the defendants' title extends to the center of the lake. Smith v. City of Rochester, 92 N. Y. 463; Gouverneur v. Ice Co., 134 N. Y. 355, 31 N. E. 865; Deuterman v. Gainsborg, 9 App. Div. 151, 41 N. Y. Supp. 185; City of Syracuse v. Stacey, 86 Hun, 441, 33 N. Y. Supp. 929. It was not made to appear at the trial, nor do

we understand it to be now claimed, that the defendants are in any wise embarrassed by restrictions of the character adverted to; but, to repel the presumption existing in their favor, the plaintiff relies mainly, if not entirely, upon the grants which his predecessors in title, Colgrove and Follett, obtained from the riparian owners, to flow their lands. These grants were executed by different parties, and at different times, but in their language they are nearly identical, and there is no difference whatever in their legal import. In short, they convey "all the right and privilege of flowing, by means of a dam erected at or on the outlet of Lime Lake, so much of lot No. —— * * * as is now flowed by said dam, and to keep the same so flowed as long as the water raised by and drawn from said dam is used for the purpose of propelling machinery." It is apparent from the language here quoted that the mill owners, in order to propel the machinery of their mill, found it necessary to increase their water power. This could only be done by raising the dam; and the addition of two feet to the height of the dam, of course, raised the water correspondingly in the lake, and caused it to overflow the lands of the adjoining owners. It was consequently to provide against this contingency, and to protect the mill owners in the enjoyment of their increased facilities, that grants were obtained from the riparian owners of the right to maintain the dam at its increased height, and to flood the lands of the latter, as long as the water raised by and drawn from the dam should be used for the purpose of propelling the machinery of the mill. But we fail to see wherein these grants diminished or in any manner affected the rights of the riparian owners in the waters of the lake, or in the ice which formed upon its surface; for while, strictly speaking, it cannot be said that they ever had any property in the waters themselves (In re Thompson, 85 Hun, 438, 32 N. Y. Supp. 897), their title, nevertheless, covered the bed of the lake, and they, consequently, had the undoubted right to use the waters thereof, and to cut and remove the ice formed thereon, provided this right was exercised reasonably, and in such a manner as not to materially diminish the volume of water in the lake, to the injury of lower proprietors (Marshall v. Peters, 12 How. Prac. 218; Dodge v. Berry, 26 Hun, 246; De Baun v. Bean, 29 Hun, 236; Cummings v. Barrett, 10 Cush. 186; Bigelow v. Shaw, 65 Mich. 344, 32 N. W. 800). It follows, of course, that, if the riparian owners conveyed no other or greater right than the mere privilege of flowing their lands, the mill owner obtained no better proprietary interest in the waters of the lake than he enjoyed previous to the execution of the grant, which, as we have seen, was limited to their use for mill purposes, subject to a prior, reasonable use thereof by the riparian owners. The record before us seems to make it quite obvious, however, that the defendants, while carrying on the ice business as a firm, took such quantities of ice from the lake as to give rise to the complaint that their use of its waters was unreasonable, in consequence of which an action was brought against them by Euchner, who was then the owner of the mill lot; and it was to compromise and set-

tle this action that the agreement of October 29, 1890, was entered into.

We are thus brought to a consideration of the effect of this instrument upon the rights of the respective parties; and in this connection it is to be observed that, as the plaintiff purchased his property in subjection to whatever rights his grantor had parted with, he occupies precisely the same attitude towards these defendants as would Euchner, if he were still the owner of the property. An examination of the agreement referred to will disclose the fact that it was evidently designed to accomplish the following objects: (1) To convey to the defendants a small strip of land therein mentioned; (2) to grant to them the unrestricted right, privilege, and permission to cut and remove ice from the lake; (3) to release them from all damages which had accrued, or which might thereafter be sustained, by reason of any interference by them with the water flowing onto the mill lot; and (4) to reserve to the grantors of these rights and privileges compensation therefor, upon the basis of one-half cent for each ton of ice cut and removed. This agreement appears to have been duly executed. Its language is neither vague nor ambiguous, and we see no reason to doubt its efficiency for the purpose for which it was designed, namely, to confer upon the defendants the right, which they did not theretofore possess, of cutting and removing ice from Lime Lake, in unlimited quantities, even if, in so doing, they injured or absolutely destroyed their grantors' mill privilege. Nor is the instrument to be regarded as a mere license. On the contrary, it is, in effect, what we have repeatedly termed it,—a grant; and the mill owner's rights in the waters of the lake, whatever they may have been, were distinct and substantive subjects of a grant. Gould, Waters, § 304; Hall v. Railway Co., 148 N. Y. 432, 42 N. E. 1056.

It is contended, however, that the clause in this agreement which provides that nothing therein contained shall be deemed to grant the exclusive right to the defendants to cut and remove ice from the lake must be regarded as a limitation upon the estate granted, and an elaborate argument is entered upon to sustain this contention upon the one hand, while upon the other it is insisted, with no little ingenuity and a quite liberal citation of authority, that the clause referred to should be treated as the habendum, and that consequently, within well-settled rules of construction, it must yield to the granting clause. In the view which we take of the case, this question, however interesting its examination might prove, is really of little or no importance; for, as we have seen, the plaintiff has no interest in the corpus of the ice, and, as to these defendants, he no longer has any interest in the quantity taken by them. It therefore does not concern him whether the defendants claim an exclusive or an unrestricted right to the ice. It rather concerns the other riparian owners, who, so far as appears, do not dispute the defendants' claim, whatever it may be.

But, even if we entertained any doubt as to the correctness of the views we have expressed respecting the relative rights of the parties under this instrument, that doubt would be resolved by the

fact that the instrument has received a practical construction at the hands of the parties themselves; for it is not denied that, after obtaining this grant, the defendants proceeded to cut and remove ice without the slightest restriction as to quantity; and this, it seems, was done with the apparent acquiescence of their grantor, Euchner. This certainly shows the understanding which the parties entertained respecting the terms of the agreement, and it should relieve that instrument of whatever uncertainty it may possess. Dodge v. Zimmer, 110 N. Y. 43, 17 N. E. 399; Woolsey v. Funke, 121 N. Y. 87, 24 N. E. 191; McClanathan v. Friedel, 85 Hun, 175, 32 N. Y. Supp. 588.

With the principal question in the case thus disposed of, it becomes necessary to determine what virtue there is in the plaintiff's remaining propositions. We must confess our inability to perceive upon what theory it is urged that the agreement which we have had under consideration is void for want of consideration, for it is conceded that it was under seal, and this of itself was at common law conclusive evidence of a sufficient consideration, although under our present system it simply raises a presumption of that fact. Torrey v. Black, 58 N. Y. 190; Code Civ. Proc. § 840. But, in addition to the presumption thus created, the instrument, upon its face, bears unmistakable evidence of mutuality, and it expressly recites that, in consideration of the rights and privileges thereby granted to the defendants, they will pay to their grantor, Euchner, his heirs, executors, and assigns, one-half cent for each ton of ice thereafter taken by them from the lake. This covenant, it appears, the defendants fulfilled, for Euchner testifies that they paid him from $100 to $135 per season under this contract. It would seem, therefore, that not only was there a consideration for the grant, but that the same was adequate and satisfactory to the plaintiff's grantor. Moreover, the instrument was executed in settlement of a disputed claim, and this fact alone would furnish sufficient evidence of a consideration to uphold it. Seaman v. Seaman, 12 Wend. 381; Feeter v. Weber, 78 N. Y. 334; Rector, etc., v. Teed, 120 N. Y. 583, 24 N. E. 1014.

The plaintiff's last contention is that the execution and acceptance of the agreement of October 29, 1890, was a recognition by the defendants of Euchner's right to the ice, which estops them from now disputing the plaintiff's claim of title thereto. We do not so regard it. It is true that by this instrument the grantor released to the defendants whatever right, title, or interest he had in and to the ice in the lake, but manifestly its main purpose was to furnish him adequate compensation for the damage which he had already sustained, or which might thereafter result from diminishing the amount of water to which he was entitled for milling purposes. This right, as we have attempted to show, was one which the riparian owners could not interfere with by an unreasonable use of the water in the lake; and by entering into the agreement, and thus compromising their differences, the defendants, in our view of the matter, simply admitted that, by taking the quantities of ice from the lake which they did, they were making such an unreasonable use or appropriation of its waters as rendered it desirable for them

to buy their peace. Upon a careful review of the entire case, we are persuaded that a proper disposition was made of it at the trial, and that the judgment appealed from should therefore be affirmed.

Judgment affirmed, with costs. All concur.