CITY OF GENEVA v. HENSON et al.

(Supreme Court, Appellate Division, Fourth Department.   July 12, 1910.)

1. NAVIGABLE WATERS (§ 4*)—OWNERSHIP OF WATERS—GRANT BY STATE OF
   PUBLIC LANDS—RESERVATION OF SOVEREIGNTY.
       A grant by one state of lands within its limits to another state, reserv-
   ing its right of sovereignty over the lands conveyed, will not be construed
   to transfer title to a navigable body of water within the territory con-
   veyed, unless required by express language in the grant.
       [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 1; Dec.
   Dig. § 4.*]

2. NAVIGABLE WATERS (§ 36*)—OWNERSHIP OF BED OF LAKE—GRANT BY STATE
   OF PUBLIC LANDS—RESERVATION OF SOVEREIGNTY.
       By treaty between New York and Massachusetts in 1786, the former
   conveyed to the latter certain territory, but reserved its right of sov-
   ereignty over the land conveyed.   The boundary of the grant passed
   through a navigable lake.   The Colony of Massachusetts asserted sover-
   eign power and title over tidal rivers within its limits, and title to all
   beds of lakes and ponds with an area of more than 10 acres also vested
   in it.   For nearly a century New York assumed absolute control and own-
   ership over the lake.   Held, that the bed of the lake did not pass by the
   treaty to Massachusetts.
       [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 184;
   Dec. Dig. § 36.*]

3. NAVIGABLE WATERS (§ 1*)—NAVIGABILITY—LAKE "NAVIGABLE."
       A lake not of sufficient size to warrant its use for maritime or com-
   mercial purposes is not "navigable" within the definition of navigable wa-
   ters, and such a lake is properly subject to individual ownership by the
   riparian owners.
       [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 11;
   Dec. Dig. § 1.*
       For other definitions, see Words and Phrases, vol. 5, pp. 4675–4684;
   vol. 8, p. 7728.]

4. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—OWNERSHIP OF BED OF
   LAKE.
       For nearly a century the state of New York assumed actual ownership
   in the bed of a navigable lake notwithstanding the treaty of 1786, where-
   by it ceded territory, of which the lake formed a part, to Massachusetts.
   Conveyances from Massachusetts to riparian owners ran to the lake and
   along its shore, and the riparian owners had made no claim of fee title
   to the bed of the lake.   Held, that the ownership in the bed of the lake
   was in New York as against the riparian owners, without reference to
   whether the cession to Massachusetts included the lake.
       [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 184,
   185; Dec. Dig. § 36.*]

5. ADVERSE POSSESSION (§ 31*)—LANDS UNDER WATER—ACQUISITION BY RI-
   PARIAN OWNERS.
       A riparian owner on a navigable lake sank a crib below the surface of
   the water a considerable distance out from the dock line.   There was no
   connection between the crib and the dock, and boats passed between the
   two, and the intervening space was dredged to enable boats to do so.   In
   1892 or 1893 the riparian owner connected the space by filling it in with
   earth and erected a new dock on top of the crib and used it.   Subsequent
   to 1901 he extended the dirt construction.   Held, that the building and
   existence of the crib under water did not show open notorious possession

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the submerged land between it and the shore, so as to put the state on notice that the riparian owner claimed title thereto.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 128–133; Dec. Dig. § 31.*]

6. NAVIGABLE WATERS (§ 37*)—LEGISLATIVE CONTROL—PUBLIC IMPROVEMENTS.

Where the health of the citizens of city and the benefit of the public demanded that a nuisance existing on land formerly a part of the bed of a navigable lake be abated, and the water had become useless for navigable purposes and was of no benefit to the state, the state had authority to transfer such land to the city and require it to convert it into a public park.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227; Dec. Dig. § 37.*]

Appeal from Trial Term, Ontario County.

Action by the City of Geneva against Robert W. Henson and others. From a judgment for plaintiff entered after a trial before referee, defendants appeal. Affirmed.

See 195 N. Y. 447, 88 N. E. 1104.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, and KRUSE, JJ.

Philip N. Nichols, for appellants.

Arthur J. Hammond, for respondent.

SPRING, J. The Cayuga & Seneca Canal connects the two lakes of the same name, with one terminus at the northwestern shore of said Seneca Lake.

By chapter 662, Laws 1900, the superintendent of public works was authorized to extend the towpath of said canal from its terminus in the city of Geneva "southerly" for a distance of "about twelve hundred feet to the opening of the Long Pier" in the harbor adjacent to said city. This improvement was made, extending through a portion of the lake, so that a considerable part of the water was left on the westerly side of the towpath. The lake is about 35 miles in length, with a surface area of more than 61 square miles, and is the second largest lake wholly within the state. It has been a navigable body of water and used as such for a great many years; and for more than 40 years a line of steamboats, with a carrying capacity of from 500 to 1,500 passengers, besides freight, has been running between Geneva and Watkins at the southerly end of the lake. When the towpath was extended, and which was a substantial bulkhead structure, that part of the water on its westerly side was rendered useless for navigable purposes. It was filled in to a considerable extent with earth and débris, the adjacent owners and the officials of the city and others contributing to make it a general depositary for refuse matter, and with the stagnant water the place became little better than a cesspool and was believed to be deleterious to public health.

By chapter 665, Laws 1905, the state of New York granted to the city of Geneva all its title and interest in these lands which had been formerly a part of and under the lake for the purpose of enabling the city to fill it in and make it a public park. The city also, in case it

became necessary, was authorized to acquire title by condemnation of all the title, rights, and easements "of any person or persons in and to said lands." This proceeding was commenced in pursuance of that act under the condemnation law in order that the city might acquire the title to all the lands within this grant and to extinguish all claims and interests thereto. The defendant Robert Henson claimed to be an owner of a lot reaching to the towpath and served an answer setting up his title. The case was tried before a referee, who rendered a report in favor of the defendant Henson to the full extent of the title and interest claimed by him. Upon appeal to this court, the judgment entered upon said report was affirmed. 121 App. Div. 893, 105 N. Y. Supp. 1110. The city appealed to the Court of Appeals, where the judgment was reversed. 195 N. Y. 447, 88 N. E. 1104. The Court of Appeals held that it was not contemplated by section 3367 of the Code of Civil Procedure that in a proceeding of this kind the question of title should be tried before a referee. However, as the parties had stipulated that such question should be so tried, and as the court had jurisdiction of the proceeding, the reversal was not based upon the fact that the issues had been determined by a referee, and upon the present appeal the parties are bound by their stipulation to refer.

The findings of fact made by the referee were all in favor of the defendant, so that the court was not able to review those supported by any evidence. It appeared, however, that for more than 60 years prior to the commencement of the action many of the deeds upon which the defendant's title depended extended to the lake and along its southerly or westerly shore. The court held that this description only carried the title of the defendant and his predecessors in interest to the shore of the lake, and that no title was obtained by him to the bed of the lake. The findings showed that a part of the claim of the defendant included land under the waters comprising the lake, and a reversal was had for that reason as one of the grounds.

The court in summing up its discussion of this branch of the case used this language at page 464 of 195 N. Y., page 1109 of 88 N. E.:

"The entire clause which we are considering, taken in connection with the conveyance of the uplands by definite shore boundaries, may perhaps be construed as sufficient to include not only any docks and buildings extending beyond such boundaries, but also the fee of the land on which they stood, and also as conveying any rights or easements in the lake and over the bed thereof belonging to the grantor incident or necessary to the enjoyment of such uplands. The grant should not be construed as transferring the fee to the bed of the lake beyond this."

The judgment of the court below also dismissed the proceeding, and the Court of Appeals held that this was improper, and that was another ground for the reversal.

Upon the last trial the findings of the referee were in favor of the plaintiff, except as to a certain part of the premises to which I will later refer and which are not involved in this appeal. All the preliminary matters, for instance, as to the fact that the plaintiff is a city, that it needs for public use the lands described in the petition for the purposes of a park, and that they are the lands described in

the act of 1905 referred to, and that it had acquired by purchase the greater part of the lands within said strip, and, in fact, all the essential preliminary facts are stipulated by the parties at the opening of the trial, and the only question left for the referee to pass upon was the issue of title raised by the answer. The judgment, among other things, orders that commissioners be appointed to ascertain the compensation to be made to the defendants Henson for the property taken.

The defendant claims title from the state of Massachusetts by virtue of the title which it acquired by the Treaty of Hartford made in December, 1786. There had long been a controversy between the colonies of New York and Massachusetts over the ownership of lands in what is now this state, and the same became acute immediately after the Revolutionary War. In order to adjust these differences, commissioners were appointed on behalf of each state, and they met at Hartford and entered into the treaty which has become famous. By it the state of New York conveyed or ceded to the state of Massachusetts the western part of the present state. The easterly line extending from Pennsylvania northward passed through the waters of Seneca Lake and far into Lake Ontario and westward in that body of water, and included a part of Lake Erie. The title to all the lands west of this boundary line became vested in the state of Massachusetts. The source of title for all conveyances made in that territory since that time has been the Massachusetts title, and its ownership to the fee of the land has always been recognized. Seneca Nation of Indians v. Appleby, 127 App. Div. 770, 112 N. Y. Supp. 177.

The state of New York reserved from this conveyance its right of sovereignty over the lands conveyed.

It is the claim of the appellant that the waters of Seneca Lake west of the boundary line referred to passed by indefeasible title to the state of Massachusetts. As already indicated, Seneca Lake was a navigable body of water, and it has been used from the time of this treaty, and before, until the present time, by such boats, ships, and craft as have plied the waters of the larger fresh water lakes in this state and the nation. We therefore start with the established fact that the lake has always been actually navigable, and in the construction of this grant to the state of Massachusetts it is important to keep this fact in mind. In a navigable body of water it is very difficult to distinguish the sovereignty or governmental control of the state from ownership in the land covered by the water. The manifest idea which always occurs in the consideration of a navigable body of water is that its primary purpose and its great value pertain to it because of its navigability. It is hardly credible, therefore, that the state will part title with the bed of a navigable body of water where it retains sovereignty over it, unless the language most explicitly indicates that such was the purpose.

Again, the sovereign grantor in conveying a body of water of this character would hardly be expected to retain the fee of the land under the water when it parts with its sovereignty and control over the waters which compose the lake. Consequently, it has become a prin-

ciple in construing a grant of this kind that, before it will be made effective to transfer the title by one state to another of a body of water which is indisputably navigable, it requires express language in the grant to make it effective. Sage v. Mayor, etc., 154 N. Y. 61, 81, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592; Matter of Mayor, etc., of N. Y., 182 N. Y. 361, 365, 75 N. E. 156; Canal Com'rs v. People, 5 Wend. 423, 451, et seq.; Commonwealth v. City of Roxbury, 9 Gray (Mass.) 451, 493.

It will be noted that the easterly boundary of the territory ceded and conveyed to the state of Massachusetts extended far into the waters of Lake Ontario, and the northerly line was in this lake.

Again, it does not seem possible that the state of New York, still retaining its sovereignty over this great lake, would absolutely convey to the state of Massachusetts the land upon which the waters of the lake rest. It was a general principle of the common law that the state owned the bed of all waters actually navigable which are within its boundaries, unless expressly conveyed. Cases cited: Seneca Nation v. Christie, 126 N. Y. 122, 27 N. E. 275; People v. Tibbetts, 19 N. Y. 523; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331.

In construing the effect of a grant of this kind, it is important to note the authority exercised by the contracting sovereign power over its navigable waters. The Colony of Massachusetts early in its history (Laws of 1647) asserted its sovereign power and title over all rivers within its domains so far as the sea ebbs and flows, and that was the test of navigability in that colony as applied to running water. And the title to all beds of lakes and ponds with an area of more than 10 acres was also vested in the state, and this early statute has been inflexibly adhered to by the courts of that commonwealth. Commonwealth v. Roxbury, 9 Gray (Mass.) 451.

Again, the state of New York without any question as to its authority has for nearly a century assumed absolute dominion and control, as well as ownership, over the lake in its entirety. Many acts have been passed by the Legislature regulating the control of the lake, directing how it should be navigated, and appropriating parts of it wherever the state deemed it necessary for public purposes and without paying any compensation to adjacent proprietors for the land taken. For instance, the state made an appropriation for building a pier at Geneva in 1862 (chapter 458, Laws 1862); and, again, in 1868 (chapter 715) and in 1870, it made an appropriation for protecting the berme bank at Seneca Lake (chapter 767); and as early as 1825 it made the lake the terminus of the canal mentioned (chapter 271); and by chapter 290, Laws 1828, directed that the level of the lake be lowered. By chapter 150, Laws 1827, the Legislature permitted "owners of lands on the shores of Seneca, Cayuga and Chautauqua Lakes to erect wharves and warehouses on the lands covered by the waters of these lakes adjacent to the lands owned by them." And, further, it permitted any adjacent owner erecting a wharf, storehouse, or storehouses upon these waters "to use, occupy and enjoy the same as if conveyed by the Commissioners of the Land Office pursuant to

the act passed February 6, 1824"; and the deeds of conveyance from 1845 down, several of them in making the transfer of the property included the "docks, buildings, fixtures, rights and privileges" which belonged to the grantor. All of these acts are incompatible with any title in the riparian owners, and the acceptance of the privileges accorded by the state establish an assent to the title of the state.

As early as 1868 the state was using these lands as of right for canal purposes, and denoted its easterly boundary by a blue line which extended between the defendant's "dock line" and the westerly shore of the lake, and that boundary remained unchanged until 1904. There was no claim by the defendant's predecessors, or those similarly situated, that the location of this blue line or the assertion of title by the state was a transgression upon any riparian owner. By statute passed in 1828 these maps, approved and certified by the canal officials as those were, "shall be presumptive evidence of the facts therein stated and of the ownership by the state of the lands therein described." Rev. St. p. 1, c. 9, tit. 9, art. 1, §§ 4–7; Laws 1837, c. 451, § 6; Rexford v. Knight, 15 Barb. 627, 641; Carpenter v. City of Cohoes, 81 N. Y. 21, 25, 37 Am. Rep. 468.

In chapter 662, Laws 1900, already adverted to and which authorized the extension of the towpath, the state exercised its functions, not in appropriating the land of private owners, but in directing a state official to use the property of the state for its purposes. Some of the acts referred to may possibly have been within the compass of its sovereignty or governmental supervision reserved in the deed or cession, but many of them can only be explained upon the assumption that the state was exercising absolute ownership.

As heretofore observed, the pre-emption line which made the easterly boundary of the lands ceded by the state of New York to Massachusetts passed through Seneca Lake. It is not reasonable to suppose that the state of New York conveyed a part of this lake through its entire length of 35 miles and yet retained the fee of the remainder.

There are certain small lakes in the state which have been designated as "navigable" and which, it has been held, passed to the state of Massachusetts by the Treaty of Hartford. In Smith v. City of Rochester, 92 N. Y. 463, 44 Am. Rep. 393, this question was discussed in considering the rights of riparian owners at the outlet of Hemlock Lake. While Hemlock Lake has been made navigable by statute, in fact it is not of sufficient size (seven miles long and one-half mile wide) to warrant its use for maritime or commercial purposes. It is only small boats which ply its waters, and it does not come within the definition of navigable waters which has been generally applied, and this is true of Gouverneur v. Nat. Ice Co., 134 N. Y. 355, 31 N. E. 865, 18 L. R. A. 695, 30 Am. St. Rep. 669, in which the lake or pond was less than half a mile in length, and also in Hazleton v. Webster, 20 App. Div. 177, 46 N. Y. Supp. 922 (affirmed 161 N. Y. 628, 55 N. E. 1096), and the lake there involved contained an area of only 35 acres. These bodies of water were properly subject to individual ownership by the riparian owners.

124 N.Y.S.—38

After all, it is of very little importance whether the state of New York ceded its ownership in the bed of the lake to Massachusetts by the Treaty of Hartford. For nearly a century at least, as heretofore noted, the state has constantly assumed acts of ownership. It has granted the privilege to riparian owners of erecting docks and wharves. On the part of the riparian owners, as stated above, the conveyances ran to the lake and along its shore line. It has designated its boundary by a blue line which is a matter of record, and in many other ways there has been a constant assertion of title by the state and with no claim by the contiguous owners of fee title by conveyance inuring to the successors of the Massachusetts ownership.

The defendant Henson, or his predecessors in interest, claim title by adverse possession. As far back as 1853 a dock had been built out from his premises into the bed of the lake, and it will be found marked on Exhibit 6. This dock had been maintained by these successive riparian owners at least since that time uninterruptedly, and the court below has held that this possession, with claim of ownership for more than 40 years, has ripened into title, and the judgment so determines, and there is no appeal by the plaintiff from that judgment.

Many years ago, and as early as in 1863, there was an old sunken crib below the surface of the water a considerable distance out in the water from the dock line referred to. This was a wooden framework about 8 or 10 feet in width, filled with stone, and there were also three old piles out in the lake at the end of the dock. There was no connection between the crib and the dock, and boats and other craft upon the lake passed between the crib and the dock without let or hindrance, and the intervening space was dredged and cleaned out to enable canal boats to pass through it. In 1892 or 1893 the appellant connected this space by filling it in with earth and erected a new dock on top of the crib and used it. After the extension of the towpath in 1901, he extended the dirt construction to the towpath. I think the building and existence under water of this small crib are not sufficiently definite and explicit acts to constitute adverse possession beyond the dock line. The crib constituted no interference with the use of the lake for navigable purposes, and there was no such open notorious possession as to put the state on notice that Henson or his predecessors were claiming title to any part of the lake founded upon this submerged crib. Since the extension referred to, sufficient time has not elapsed to establish ownership against the state.

I think the Legislature did not exceed its authority in permitting the state to convey the land outside of the towpath to the plaintiff. The water had become useless for navigable purposes and was of no benefit to the state. The city of Geneva was a municipal corporation, so made by the state, and the health of its citizens and the benefit of the public demanded that this nuisance be abated, and I think the state was well within its powers in transferring the land to the city of Geneva and requiring it to convert it into a public park.

I do not deem it necessary to consider the other questions discussed on the briefs.

The judgment should be affirmed, with costs.

Judgment affirmed, with costs. All concur.